**STEER and ADAIR, Partners, Plaintiffs, v. LAND TITLE GUARANTEE AND TRUST CO., and OHIO TURNPIKE COMMISSION, Defendants.**

Common Pleas Court, Franklin County.

No. 185644.   Decided May 19, 1953.

## 34

**OPINION**

By HARTER, J.

LAND TITLE GUARANTEE AND TRUST COMPANY CONTRACT FOR FURNISHING OF "TITLE SERVICES" TO TURNPIKE COMMISSION DECLARED TO BE VOID AS UNAUTHORIZED PRACTICE OF LAW BY A CORPORATION

By a decision in a mandamus action, rendered July 9, 1952, the Supreme Court of Ohio, in the case of **State, ex rel. Ohio Turnpike Commission v. Allen, Secretary-Treasurer of the Ohio Turnpike Commission, 158 Oh St, 168,** resolved all of the legal problems which were then impeding the construction of the Ohio Turnpike across northern Ohio, **excepting one.** This case involves that **excepted problem.**

The nature of the problem now being considered (and the one which the Supreme Court did not in their case attempt to resolve) is succinctly stated by the Supreme Court in their opinion, as follows, page 178:

"Finally, the respondent contends that the commission has entered into a contract with a title company to perform services that will constitute the practice of law. This, he insists, will involve an unconstitutional use of the funds of the commission. The title company is not a party to this action, and hence the court, of course, does not assume to adjudicate its rights in its absence. However, the court does hold that the commission may enter into a contract with a title company for the examination and guarantee of land titles **provided that such services are limited to those defined by this court in the case of Land Title Abstract & Trust Co., v. Dworkin, 129 Oh St, 23, 193 N. E. 650.**" (Emphasis added.)

Now that the Land Title Guarantee and Trust Company is properly before this court, our specific problem, in the present litigation, is whether the **proviso** thus expressly mentioned by the Supreme Court has been complied with in the contract (and practices thereunder) which the Ohio Turnpike Commission has entered into with the Land Title Guarantee and Trust Company.

A preliminary "background" statement is appropriate before we undertake an analysis of the facts and law of this case.

As the petition was originally filed in this court in this case on July 22, 1952, the plaintiffs sought immediately to enjoin all work on the Turnpike. However, as a result of an extended hearing on August 1, 1952, on the question of whether an immediate injunction should issue, the court suggested that the legal question here was of such great importance to the public generally that it should be decided without the "crisis atmosphere" of an "injunctive relief" case  To obtain an "unhurried" atmosphere, the court suggested, and the parties acceded, that an amended petition should be filed in which the request for an injunction would be withdrawn and the prayer would be, simply, for a declaration by the court as to whether The Land Title Guarantee and Trust Company was, as a corporation, actually engaged in the unlawful practice of law in discharging the obligations of its contract with the Ohio Turnpike Commission.

Following the August 1, 1952, hearing, the pleadings of all parties were filed and the case was duly advanced for trial, out of its regular order (because of the importance of the questions presented). The trial took place on October 30, 1952, and the parties then were granted leave to file their respective briefs. It was not until May 2, 1953, however, that the final brief was filed, and the case then became ready for decision.

With this recital of "background," we will, as briefly as possible, state the facts. On June 4, 1952, The Land Title Guarantee and Trust Company entered into a contract. based upon a bid by that company, with the Ohio Turnpike Commission, which required The Land Title Guarantee and Trust Company to perform, not solely for itself, but rather **for the Turnpike Commission** and for a consideration in money, the following, among other "Title Services":

(1) Examine the title to the right-of-way parcels involved (paragraph 5c).

(2) Prepare a legal description of the parcels (paragraph 5d).

(3) Prepare and transmit to the Turnpike Commission (paragraph 5e), a "preliminary title report" for each parcel, such report to contain (1) "the nearly complete legal description * * * of the right-of-way parcel * * *" (2) "a statement of the approximate acreage of the right-of-way parcel; (3) a statement of the approximate acreage of the entire ownership parcel; * * *" (6) **"a statement of all the title defects and encumbrances against the right-of-way parcel; including mortgages, liens, leases, etc., to which Title Co., will take an exception * * * unless cleared by appropriate means; (7) "a statement of the instruments or actions which Title Co., will require in order that Title Co. will issue either its title-insurance policy**

or its title guarantee with respect to the **right-of-way parcel with no exception as to such defects or encumbrances;** and (8) recording data * * * sufficient to enable the draftsman of the right-of-way parcel to comply with §2573 GC * * *."

(4) Later, examine the documents by which the Turnpike Commission proposes to acquire title to a parcel, or by which the Commission has cured, or proposes to cure, defects **"and inform the commission in writing if there are any further title defects or encumbrances to which Title Co., would take exceptions * * *"** (paragraph 5K).

(5) Keep "records and evidences including 'chain sheets'" available to the Commission for three years (paragraph 5o). (Verbatim language is used and emphasis is added.)

Attention is directed to the fact that all of the foregoing, specifically enumerated "services" are to have been rendered (excepting only the "three-year preservation of records" item) well in advance of the issuance of any policy of title insurance or title guarantee by The Land Title Guarantee and Trust Company to the Ohio Turnpike Commission. It is also significant that these contracted-for "services" would have to be rendered whether or not a policy of title insurance, or a title guarantee, is ever issued (in the event of change of route, for example).

The "stipulation" as to the facts of this case, and the oral evidence adduced October 30, 1952 in open court, serve to elaborate upon the practices engaged in under this June 4, 1952, contract.

A copy of the "Trust Agreement" under which the Turnpike Commission issued its bonds was tendered into evidence at the October 30, 1952, trial and this court reserved its ruling on the admissibility of such "Trust Agreement" into evidence. As we view the issues in this case, we doubt the necessity of admitting this exhibit into evidence as we do not see its materiality to the issues. Accordingly, it will not be admitted.

As we view the issue of law before this court in this litigation, that issue may be stated, at the risk of over-simplification, as

Do the foregoing "services" (which the Land Title Guarantee and Trust Company are required to perform under the contract with the Ohio Turnpike Commission) constitute the unauthorized practice of law by a corporation when they are performed for a consideration (as specified in the June 4, 1952 contract) and for a party other than the Land Title Guarantee and Trust Company itself?

The Supreme Court, in the case of **State, ex rel. Ohio Turnpike Commission v. Allen, Secretary-Treasurer, 158 Oh St 168,**

(as decided July 9, 1952 and as commented upon at the start of this opinion) delineated the approach which should be used in testing the legality of the Land Title Guarantee and Trust Company contract. Quite obviously, the Supreme Court recognized that a title company could legally examine and guarantee or insure land titles, but the Supreme Court expressly limited and qualified its holding in that connection by stating

"provided that such services are limited to those defined by this Court in the case of **Land Title Abstract & Trust Co. v. Dworkin, 129 Oh St 23, 193 N. E. 650.**"

A clear understanding of the holding in the Dworkin case thus becomes the keystone to a proper analysis of our present problem. Two quotations from page 27 of the Dworkin opinion give the problem there being considered:

"The plaintiffs in error predicate their right to furnish opinions and certificates of title, regardless of whether or not they insure or guarantee such title, upon the provisions of §9850 GC, and claim that full authority was conferred upon said companies by this statute to perform the acts set forth in the first paragraph of the order of injunction."

&ast;  &ast;  &ast;  &ast;

"Plaintiffs in error claim they are authorized by this statute not only to prepare abstracts of title and insure titles to real estate, but also have a separate and distinct authority to furnish an opinion as to the validity of a title, though it does not exercise its authorized functions as an insurer or guarantor of such title."

The Supreme Court, also on page 27 of their opinion in the Dworkin case, answered these contentions in this language:

"We are persuaded that the great weight of authority supports the proposition that furnishing such opinion, whether in a so-called statement or certificate of title, falls within the realm of the practice of law. Corporations are expressly precluded from the practice of law. Since a corporation may not practice law, if the acts brought into question here constitute the practice of law, it follows that a corporation may not lawfully perform any of such acts."

Quite obviously, there is no need for us to elaborate upon the authorities supporting this Supreme Court holding or the reasons for prohibiting a corporation from practicing law. This Court holds and, indeed, all parties to this litigation agree, that this pronouncement by the Supreme Court in the Dworkin case states the law which must be applied here.

A corporation simply cannot invade the realm of the practice of law by furnishing, to parties other than itself, an opinion "whether in a so-called statement or certificate of

title" to use the Supreme Court's Dworkin case language, or (and here we add terms to bring our present facts into line with the Dworkin holding) in a "preliminary title report" (paragraph 5e, of the June 4, 1952 Contract) or in a letter designed to "inform the Commission in writing if there are any further title defects or encumbrances to which Title Company would take exception" (paragraph 5 K of the June 4, 1952 Contract).

There is, of course, no true significance in the choice of particular words used to describe the "opinion" which is regarded as the practice of law. All courts look through the "form," or label, applied to the act, to consider its "substance."

Since all parties agree, and the Supreme Court has expressly held in the Allen case, that the Dworkin decision sets forth the applicable law for our present case, it ought to be possible for us to terminate the present opinion at this point. However, counsel for the Land Title Guarantee and Trust Company zealously contend that the Dworkin case does not state all of the law applicable to our present problem; on the contrary, they assert that language used by the Supreme Court in the later case of **Judd v. City Trust & Savings Bank, 133 Oh St 81,** is the true answer to the fact pattern which the Land Title Guarantee and Trust Company has created in its June 4, 1952 contract with the Ohio Turnpike Commission. The title company asserts, repeatedly throughout their briefs, that the following language from page 92 of the Judd opinion shows that the Supreme Court would, in a case properly before them, approve of the present "Title Service" contract:

"* * * services performed by such companies exclusively in the business of guaranteeing titles, even though they do touch upon the practice of law, should not be branded as illegal, being merely incidental to a sanctioned enterprise.

"In other words, so long as title guarantee and trust companies confine their activities to performing services beneficial to themselves in the prosecution of their approved business, the necessarily appurtenant benefits of a legal complexion to other persons does not make such pursuit unlawful."

This court was of the opinion at the time of the August 1, 1952 hearing (as he then attempted to explain orally—Record at that hearing, page 63) and is still of the opinion that a salaried lawyer for a title company may render an opinion to his own corporate principal without being guilty of unauthorized practice of law; but when that corporate principal "sells" that opinion, legal in nature, to an outsider, that corporate principal is guilty of illegally practicing law. We feel quite strongly that the corporate principal is still

guilty of unauthorized practice of law by making such a "sale" of a legal opinion to a third party even though that legal opinion was prepared for it by its salaried lawyer, directly in the course of the corporate principal's own legitimate business activities. The vice in the equation comes from the "sale," for a consideration, to an outsider. It is, as we view it, a clear duty of the corporate principal to keep the legal opinions prepared by its salaried employees to itself. The outsiders should, quite clearly under the Ohio Supreme Court decisions in the Dworkin and Judd cases (supra), obtain their own legal opinions from lawyers of their own choosing. Parenthetically, it might well be observed that, if such outsiders so desire, they could have their own salaried lawyers prepare legal opinions for them without the violation of any unauthorized practice of law rules. It is only when the legal opinions of captive, salaried lawyers become, in effect, the subject of barter on the market place by the corporate principals of such captive lawyers that we have the type of illegal, unauthorized practice of law by the corporations which has been so consistently condemned by the Supreme Court of Ohio in the past.

Let us apply this reasoning to the language last above quoted from the Supreme Court of Ohio in the Judd opinion. In so doing, it must be noted that the Judd language makes absolutely no reference to the "sale" of the opinions, or legal services, to outsiders. This patent ignoring of "price to be paid," or consideration in money or money's worth, is, we believe, vitally significant. It is inconceivable to us that our Supreme Court would ever expect its language in the Judd case to be used (tortured, if that term is preferred) as a justification for a bartering of any kind of legal service—the historical background of the legal profession abhors such a possibility. The legislature of Ohio has followed through in this traditional vein of excluding corporations from the practice of law with the enactment of such statutes as §§1698 and 8623-3 GC.

Entertaining these views as to the proper "approach" to the solution of our problem in this case, we do not deem it truly necessary that the question of "timing" be considered; by "timing," we refer (1) to the emphasis by plaintiffs upon the fact that the legitimate insuring, or guarantee, of titles by the Land Title Guarantee and Trust Company comes much later in the sequence of activities under the June 4, 1952 contract with the Turnpike Commission than the preliminary "title service" activities, and (2) to the related "timing" contention advanced on behalf of the Land Title Guarantee and Trust Company to the effect that it must, in its appraisal of

the risk which it must ultimately bear, do the preliminary surveying of records and form its opinion thereon as a condition precedent to its ultimate, entirely legal function of guaranteeing or insuring titles. A reduction of our problem to a simple problem of "timing"—i. e. which act comes first and which last—is, we believe, clear over-simplification of a highly complex problem and a reducing of the question to one of "mechanics" when "logic" is required. We choose, rather, to look to the "consequences" of the several acts involved. One such "consequence" which we believe must be avoided is the bartering, for a price, of legal opinions on title on the market by corporate principals—the illegal exploiting by the corporate principals of the work of their salaried lawyers.

The attorneys for the Land Title Guarantee and Trust Company refer, in their briefs, to §9850 GC, and §9510 GC, as statutory authorization for their activities. These statutes do, certainly, give title companies certain specified corporate powers. But they **do not** give title companies power to over-reach their proper spheres of activity. Any statute which would attempt to sanction, or even hint at the propriety of, a corporation's practicing law would be obviously invalid. See Syllabus 2 of State, ex rel. Thatcher v. Brough et al. 15 Ohio Circuit Court Reports (new series 97, affirmed without opinion **90 Oh St 382**).

Plaintiffs assert that it is significant that the June 4, 1952, contract between Land Title Guarantee and Trust Company and the Ohio Turnpike Commission provides for payment by the Turnpike Commission of such a substantially larger fee for the preliminary title services than for, ultimately, the guarantee of title or title insurance policy. We do not agree that this disparity in the rate of compensation for the various acts is vital. So long as anything, however small an amount, is paid for the barter of a legal opinion by one corporation to another corporation or commission, we believe we have unauthorized practice of law by the corporation "selling" the opinion. As we see it, it is immaterial whether a single fee is charged, or many separate fees, for a series of acts.

While it is in no way "material" to this opinion in the "legal" sense, it might well be appropriate for this court to attempt a "practical" explanation of this situation. Let it be assumed that the so-called "title services" required in the acquisition of the Turnpike right-of-way, as heretofore explained, were performed by salaried lawyers of the Turnpike Commission (rather than salaried lawyers of the Land Title Guarantee and Trust Company) and that the results of their work was made available without charge to the Land Title Guarantee and Trust Company for that company's use in appraising the

risk which would be involved in the insuring or guaranteeing of the titles. Any potential duplication of legal services would thus be avoided and, at least in theory, the "cost" of insuring or guaranteeing titles by the Title Company could be held to a minimum.

There is no practical or legal objection to such a procedure. The sole problem involved in such procedure would be that of whether Land Title Guarantee and Trust Company would have the requisite confidence in the accuracy of the work done by the Turnpike lawyers to rely upon it in committing their company to the insuring or guaranteeing of the titles in reliance thereon.

This court orally suggested a solution to this "reliance" problem on August 1, 1952, which we still believe to be feasible: let Land Title Guarantee and Trust Company grant leaves of absence to its salaried lawyers—lawyers in whom the Title Company obviously had confidence; let the Turnpike Commission employ them; and then the construction of the Turnpike could proceed. There would be no needless duplication of legal services in such an operation. The entire process would be "practical" as well as "legal."

The Land Title Guarantee and Trust Company representatives flatly rejected the foregoing suggestion when made in August of 1952. We believe such rejection was predicated upon their wishful thinking that they could legally over-reach their proper field of insuring or guaranteeing titles and "sell" the legal opinions of their captive, salaried lawyers to the Turnpike Commission and make, in effect, a "merchant's profit" thereon. Such a "merchant's profit" is clearly not allowed in the field of law practice, and should not be when the essentially **personal** relation between a lawyer and his client is borne in mind.

Pursuant to the prayer of plaintiff's amended petition, this Court declares that the performance of the June 4, 1952 contract by the Land Title Guarantee and Trust Company constitutes the unlawful practice of the law; that because the issuing of policies of title insurance or guarantee (which would be entirely legal and proper activity for the Land Title Company) cannot be effectively separated from the "illegal practice of the law" phase of the contract, the entire contract becomes illegal and void.

The amended petition further prays that this Court order the defendant, The Land Title Guarantee and Trust Company, to pay back any sums received by it from the Ohio Turnpike Commission under said contract. In equity and good conscience, the Land Title Guarantee and Trust Company should

certainly do this since they (rather than the Turnpike Commission) were the ones guilty of over-reaching their corporate powers. There is, however, a procedural problem raised at this point. Plaintiffs do not sue as "taxpayers" in this case. This is not, therefore, a so-called "Taxpayer's Action " Even if it were a typical action by "taxpayers," as such, to interfere with or direct the acts, measures or proceedings of a public body or its officers or agents, there would still be legal obstacles to the granting of a "pay-back" order. In the first place, this action is upon the "State of Ohio" level—not the level of a municipality, or county, or township. There is substantial authority to the effect that a proceeding by a taxpayer to restrain an alleged unwarranted action of public officials cannot be maintained if the state itself is a necessary or proper party defendant, and this is so although the state is not a party to the record. See 52 American Jurisprudence—Taxpayers' Actions, Section 6.

In the second place, there is substantial authority for the proposition that a taxpayer cannot maintain an action to enjoin the wrongful expenditure of public funds, where such funds were not raised by taxation. The Ohio Turnpike funds were raised through the sale of bonds, not by taxation. Hence, these authorities might well become applicable, should this case be considered a true "taxpayer's action." See 52 American Jurisprudence—Taxpayers' Actions, Section 9.

An annotation in 58 American Law Reports 588 indicates that there is a sharp difference of authority among the states as to the right of individual citizens to challenge the acts of state officials.

It is this Court's view that since there is such doubt on this procedural question, the doubt should be resolved by refusing to grant the extraordinary order for paying back all money received by the Land Title Guarantee and Trust Company. In other words, it is our opinion that relief as drastic and harsh as that here requested should be granted only upon clear authority.

This Court shares the view of the vast majority of the citizens of Ohio that the Turnpike should be built and as speedily as possible. Our action of August 1, 1952, in inducing the plaintiffs to withdraw their request for immediate injunctive relief should be conclusive evidence of this Court's attempt at cooperation with the Turnpike effort. It is also a tribute to the sincerity of the plaintiffs that they willingly acceded to the Court's suggestion at that time. However, we cannot for expediency's sake, close our eyes to the fact that the Land Title Guarantee and Trust Company has, by its contract with

the Ohio Turnpike Commission for the furnishing of "Title Services," clearly over-reached the bounds of its legitimate corporate powers and invaded the field of the practice of law —a field which is completely closed to corporations in Ohio.

Quite obviously the plaintiffs and the defendants will each wish to preserve their exceptions to this decision. The Journal Entry which will be prepared by counsel may reserve such exceptions. Costs should be assessed against the defendants.