**NATIONAL TREASURY EMPLOYEES UNION, Appellant,**

v.

**UNITED STATES DEPARTMENT OF the TREASURY, Internal Revenue Service, et al.**

No. 78–1085.

United States Court of Appeals, District of Columbia Circuit.

June 19, 1981.

## SUPPLEMENTAL OPINION

Before ROBINSON, Chief Judge, TAMM, Circuit Judge, and GESELL,* District Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

Opinion concurring in the result filed by Circuit Judge TAMM.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

John H. Anderson prosecuted a suit in the District Court against the Internal Revenue Service under the Privacy Act of 1974.[1] After prevailing on the merits, he moved for an award of attorney's fees.[2] The amount he sought was reached by placing a market value on the services his two lawyers had rendered.[3] That far, Anderson's motion gave the appearance of a matter comparatively routine in nature.

What made it something else was the nature of the relationship preexisting between Anderson's counsel and a labor organization, particularly with respect to court-awarded attorney's fees. As salaried employees of the National Treasury Employees Union, they had represented Anderson pursuant to the union's prepaid legal services plan,[4] and had been compensated by the union at rates well below those utilized in the computation of the fees requested.[5] The union claims that the fees belong to it rather than counsel,[6] and the fee award was sought, not for counsel, but for the union. The District Court, resolving to limit the recovery to the union's financial outlay on Anderson's behalf, allowed only $2,000 in fees, observing that more would "result in a windfall profit to the union at the expense of the public fisc."[7]

When we addressed this appeal earlier, we deemed pivotal the frank reaffirmation of union counsel at oral argument that all fees realized in consequence of Anderson's motion would go into the union's treasury.[8] We held that "[s]ince the objective in this case is essentially a fee award for the union and not for counsel themselves ... no fee exceeding the expenses incurred by the union—in terms of attorney's salaries and other out-of-pocket expenses—should be allowed."[9] A higher award, we reasoned, would permit the union to reap a profit on the services its attorneys had furnished Anderson, and thereby involve the union in the unauthorized practice of law.[10] Thus we concurred in the District Court's analysis, though we directed remand of the case for recalculation of the amount proper.[11]

Shortly after our opinion issued, however, the court elected to accord *en banc* reconsideration to *Copeland v. Marshall*,[12] a case involving a superficially related problem.

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. 5 U.S.C. § 552a (1976).

2. See 5 U.S.C. § 552a(g)(3)(B) (1976), quoted *infra* note 17.

3. Appendix (App.) 118–129.

4. See *Anderson v. United States Dep't of Treasury*, Civ. No. 76–1404 (D.D.C. Nov. 19, 1977) (order granting attorney's fees and litigation expenses) at 2, App. 146.

5. App. 132, 136.

6. See Motion of National Treasury Employees Union for Substitution as Party-Appellant, ¶ 2, quoted in relevant part *infra* note 23.

7. *Anderson v. United States Dep't of Treasury*, *supra* note 4, at 3, App. 147.

8. *Anderson v. United States Dep't of Treasury*, 648 F.2d 1 at 3 (D.C.Cir. 1979) (per curiam). Our opinion issued in slip form but, because consideration of a suggestion of rehearing *en banc* has been deferred, see text *infra* at note 15, the opinion has not heretofore been submitted for official publication.

9. *Anderson v. United States Dep't of Treasury*, *supra* note 8, text at note 21.

10. See *id.*, text at notes 20–21.

11. The occasion for remand is the silence of the record on the cost to the union of supplying the attorneys' services to Anderson. *Id.*, text at note 22.

12. 205 U.S.App.D.C. 390, 641 F.2d 880 (1980 *en banc*).

The question in *Copeland* was whether awards of attorney's fees in Title VII suits against federal agencies [13] are to be measured by the market value of the attorney's services or instead by his costs plus a reasonable profit.[14] With the appearance, at least superficially, of a possible relationship between the problems there and here, we deferred action on Anderson's suggestion for rehearing *en banc* and stayed our mandate pending resolution of *Copeland*.[15]

Our *Copeland* decision has now been announced,[16] and we find nothing in it—or in the vigorous arguments of appellant and amici curiae for rehearing *en banc* in this case—to lead us to believe that our original ruling was in error. Nonetheless, because we may not have been fully understood, we deem it appropriate to issue, *sua sponte*, a supplemental opinion elaborating on the principles underlying our earlier adjudication, and on the limited nature of our holding.

## I. THE BASIS OF OUR HOLDING

Were this a case wherein attorney's fees were requested for the attorneys themselves, our approach would be completely conventional. The Privacy Act authorizes assessment against the United States of reasonable fees in favor of a complainant who has substantially prevailed.[17] Congress has made plain that fee determinations in such instances are to be reached by consideration of "the criteria as delineated in the existing body of law governing the award of fees,"[18] and *Copeland* points the way to market value of services as the general standard.[19] The mere fact that Anderson's counsel were salaried employees of the union would not affect the size of the fees to which they would be entitled,[20] nor would the governmental character of the agency required to pay them.[21] In sum, the allowance would emerge as the product of the same methodology applicable to any other legal practitioner requesting an attorney's fee for himself in a Privacy Act case.

What makes for the difference here is the simple fact that the fees are not sought for the lawyers who had handled Anderson's case, but for the union in whose hire they did so. Of that there can be no doubt. At oral argument, union counsel told us that the entire fee recovery would be turned over to their employer; moreover, the union itself asserts the claim that whatever fees are forthcoming will belong, not to the lawyers, but to it.[22] So patent it is that the union is the real party in interest that we have granted its motion for substitution as

13. Civil Rights Act of 1964, Pub.L.No. 88–352, tit. VII, §§ 701 *et seq.*, 78 Stat. 253 (1964), as amended by Equal Employment Opportunity Act of 1972, Pub.L.No. 92–261, §§ 2 *et seq.*, 86 Stat. 103 (1972), codified, as further amended, variously at 42 U.S.C. §§ 2000e *et seq.* (1976) [hereinafter cited as codified]. Authority to allow attorney's fees in such cases is conferred by 42 U.S.C. § 2000e–5(k) (1976).

14. See Part II(B) *infra.*

15. *Anderson v. United States Dep't of Treasury*, No. 78–1085 (D.C. Cir. *en banc* Nov. 9, 1979) (order).

16. *Copeland v. Marshall, supra* note 12, 205 U.S.App.D.C. at 418, 641 F.2d at 908.

17. "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed." 5 U.S.C. § 552a(g)(3)(B) (1976). See also 5 U.S.C. § 552a(g)(2)(B) (1976).

18. "Reasonable attorney fees and costs may be assessed against the government in any case where the plaintiff substantially prevailed. It is intended that such award of fees not be automatic, but rather, that the courts consider the criteria as delineated in the existing body of law governing the award of fees." H.R. Rep.No. 1416, 93d Cong., 2d Sess. 17 (1974). See also S.Rep.No. 1183, 93d Cong., 2d Sess. 83 (1974), U.S.Code Cong. & Admin.News 1974, p. 6916.

19. While *Copeland* involved a fee award under Title VII, it is manifest from our opinion that we subscribed to market value as the formula normally to be utilized. See *Copeland v. Marshall, supra* note 12, 205 U.S.App.D.C. at 404, 641 F.2d at 894.

20. *Id.* at 408–410, 641 F.2d at 898–900.

21. See *id.* at 404–406, 641 F.2d at 894–896.

22. See note 23 *infra.*

the appellant herein in Anderson's stead.[23] No less now than earlier, we must treat the matter for what it really is—a quest by the union to recover attorney's fees aggregating more than the cost to it of supplying the legal services Anderson utilized in his Privacy Act suit.

The obstacle the union faces is rooted in canons prescribed by the American Bar Association's Code of Professional Responsibility.[24] While technically not binding on the court and, of course, in any event subordinate to any contrary dictate of federal law,[25] the Code enshrines the collective wisdom of the legal profession on what is acceptable behavior within its ranks. Beyond that, the ethical considerations and rules comprising the Code derive their considerable force from the power of the bench and bar to discipline errant attorneys,[26] and they afford the public its best assurance of competent and responsible legal service.[27] We believe, then, that the principles the

Code effectuates are due great deference in the absence of any countervailing reason of law or policy.[28] And, as we indicated in our original opinion,[29] we think the Code stands squarely athwart the road that the union hopes to travel.

Quite conspicuously, the Code's strictures on the attorney's professional alliances strongly exert their influence here.[30] Lawyers are free to accept employment by an organization offering a prepaid legal services plan to its members,[31] but only if "[s]uch organization, including any affiliate, is so organized and operated that no profit is derived by it from the rendition of legal services by lawyers. . . ."[32] This restriction is closely related to two more of the Code's most fundamental prohibitions. Attorneys may not split fees with laymen or lay organizations,[33] or enable them to engage in the unauthorized practice of law.[34] Courts [35] and bar groups [36] alike have re-

---

**23.** See Fed.R.App.P. 43(b). In its motion for substitution, the union alleged "that the award of attorney's fees is presently the exclusive concern of [Anderson's] union, . . . in that any award of fees will go directly to [the union], and not to [Anderson]." Motion of National Treasury Employees Union for Substitution as Party-Appellant, ¶ 2. The motion then avers that "[a]ccordingly, all interests in this appeal have devolved from . . . Anderson to [the union], and [the union] should be able to prosecute any further proceedings concerning this appeal in its own right." *Id.* ¶ 3.

**24.** American Bar Association, Code of Professional Responsibility (1976) [hereinafter cited at ABA Code of Professional Responsibility].

**25.** See, *e.g.*, *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *United Transp. Union v. Michigan Bar*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *UMW v. Illinois State Bar Ass'n*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brotherhood of R.R. Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328 9 L.Ed.2d 405 (1963).

**26.** See H. Drinker, Legal Ethics 34–38 (1953).

**27.** See ABA Code of Professional Responsibility, *supra* note 24, Ethical Consideration (EC) 3–1, quoted *infra* note 37.

**28.** We are afforded no statutory guidance toward the proper level of a fee award here; the pertinent provision of the Privacy Act merely authorizes assessment of "reasonable attorney fees and other litigation costs" against the United States. See note 17 *supra*.

**29.** *Anderson v. United States Dep't of Treasury, supra* note 8, at 3.

**30.** See generally ABA Code of Professional Responsibility, *supra* note 24, canon 2.

**31.** See *UMW v. Illinois State Bar Ass'n, supra* note 25, 389 U.S. at 222–225, 88 S.Ct. at 356–358, 19 L.Ed.2d at 430–432.

**32.** ABA Code of Professional Responsibility, *supra* note 24, Disciplinary Rule (DR) 2–103(D)(4)(a). *Cf. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 461–462 & n.19, 98 S.Ct. 1912, 1921 & n.19, 56 L.Ed.2d 444, 456–457 & n.19 (1978).

**33.** ABA Code of Professional Responsibility, *supra* note 24, DR 3–102.

**34.** *Id.*, DR 3–101(A).

**35.** See, *e.g.*, *Georgia State Bar Ass'n v. Lawyers Title Ins. Co.*, 222 Ga. 657, 151 S.E.2d 718 (Ga.Sup.Ct.1966); *Frazee v. Citizens Fidelity Bank & Trust Co.*, 393 S.W.2d 778 (Ky.1964); *Kentucky State Bar Ass'n v. First Fed. Sav. & Loan Ass'n*, 342 S.W.2d 397 (Ky.1960); *Judd v.*

peatedly endorsed these ethical maxims. We, too, recognize their inestimable value as safeguards against the imposition of incompetent and irresponsible law practice on the public.[37]

To honor these wholesome principles here is hardly the radical step that the union charges. Indeed, as our earlier opinion noted,[38] obedience is expressly required by an *en banc* decision of this court:

> It is our view that the award [of attorney's fees] must go to counsel rather than to the organizations which pay their salaries. . . . This procedure avoids all problems of whether the organization might, by receiving an award directly, be involved in the unauthorized practice of law. On the other hand, . . . counsel [must] reimburse their respective organizations for the kinds of expenses they incurred which would normally be includ-

ed in an attorney's fee. . . . But any amount in excess of such reimbursement belongs to counsel themselves.[39]

The admitted fact here is that the employing organization—the union—compensated the lawyers who represented Anderson at rates well below the going value of their services on the open market.[40] Manifestly, then, the union would profit—perhaps handsomely—on the legal activities of those lawyers under any arrangement whereby market-value fees wend their way into the union's general treasury.

Drawn as we are into the area of the attorney's professional relationships, we remain sensitive to the danger of inadvertently treading on associational or other constitutionally-grounded rights.[41] We therefore take pains to identify certain activities with respect to which we perceive no legal objection. Reasonableness, in terms of

---

*City Trust & Sav. Bank*, 133 Ohio St. 81, 10 Ohio Ops. 95, 12 N.E.2d 288 (Ohio Sup.Ct. 1937); *Steer v. Land Title & Guar. Trust Co.*, 65 Ohio L.Abs. 33, 113 N.E.2d 763 (Ohio Ct.Com. Pleas 1953); *Rhode Island Bar Ass'n v. Automobile Serv. Ass'n*, 55 R.I. 122, 179 A. 139 (R.I.Sup.Ct.1935).

**36.** See American Bar Association, Opinions on Professional Ethics 290 (Opinion 48), 452 (Opinion 180), 648 (Opinion 294) (1967); 1 Informal Ethics Opinions 137–138 (Informal Opinion 544) (1975); Digest of Bar Association Ethics Opinions 647, 1272, 1391, 1429, 2245, 3020, 3304, 3610, 3735 (O.Maru ed. 1970); 1970 Supp. to the Digest of Bar Association Ethics Opinions 5048, 5061, 5190, 5935 (O.Maru ed. 1972); 1975 Supp. to the Digest of Bar Association Ethics Opinions 7509, 9178 (O.Maru ed. 1977).

**37.** The prohibition against the practice of law by a layman is grounded in the need of the public for integrity and competence of those who undertake to render legal services. Because of the fiduciary and personal character of the lawyer-client relationship and the inherently complex nature of our legal system, the public can better be assured of the requisite responsibility and competence if the practice of law is confined to those who are subject to the requirements and regulations imposed upon members of the legal profession.
ABA Code of Professional Responsibility, EC 3–1.
A non-lawyer who undertakes to handle legal matters is not governed as to integrity or legal competence by the same rules that

govern the conduct of a lawyer. A lawyer is not only subject to that regulation, but also is committed to high standards of ethical conduct. The public interest is best served in legal matters by a regulated profession committed to such standards. The Disciplinary Rules protect the public in that they prohibit a lawyer from seeking employment by improper overtures, from acting in cases of divided loyalties, and from submitting to the control of others in the exercise of his judgment. Moreover, a person who entrusts legal matters to a lawyer is protected by the attorney-client privilege and by the duty of the lawyer to hold inviolate the confidences and secrets of his client.
*Id.*, EC 3–3 (footnote omitted).
Since a lawyer should not aid or encourage a layman to practice law, he should not practice law in association with a layman or otherwise share legal fees with a layman.
*Id.*, EC 3–8 (footnote omitted).

**38.** *Anderson v. United States Dep't of Treasury, supra* note 8, text at note 20.

**39.** *Wilderness Soc'y v. Morton*, 161 U.S.App. D.C. 446, 457, 495 F.2d 1026, 1037 (*en banc* 1974), *rev'd on other grounds sub nom. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

**40.** Plaintiff's Opposition to Defendants' Response to Application for Award of Fees and Expenses, App. 136.

**41.** See cases cited *supra* note 25.

market value of the services rendered, is the sole limit on fee awards to organizationally-hired lawyers when the fees are to be paid to the lawyers alone.[42] The organization, whatever its character, may recoup in full the expense it incurred in supplying the services to the client.[43] Lawyers may, if they wish, voluntarily donate some or all of their fees to charity,[44] or even to their employers,[45] just as they may spend their other monies as they please.

None of these situations is before us, however. Rather, the settled expectation of the union employer and the employed attorneys that all fees recovered belong to the union means that the employing lay organization would capitalize on the attorney's services, reap a profit therefrom, and put the monies thus made to any use it chooses. In the absence of any compelling reason to disregard the ethical considerations implicated—and we discern none here—we believe that an allowance of above-cost fees to the union is inappropriate.[46]

## II. THE LIMITS ON OUR HOLDING

The union and amici curiae advance two principal arguments for an award of market-value fees in this instance. To do otherwise, the union suggests, will bring us inevitably into conflict with our recent holding in *Copeland*.[47] Amici offer an even more apocalyptic scenario: our decision, they contend, will destroy the public interest bar by squeezing out of existence those legal aid organizations that depend on court-awarded attorney's fees for part of their funding.[48]

Certainly, if true, these would be powerful objections. But onto every parade of horribles some dispersing rain must fall, and we are not persuaded that our decision will have such baleful effects. On the contrary, these criticisms reveal a profound misunderstanding of the principles underlying our original opinion, and as well a failure to appreciate the limited nature of our holding.

### A. *Implications for the Public Service Bar*

Amici point out that a number of courts have approved market-value attorney's fee allowances directly to legal aid offices and public interest organizations. We are aware that at least nine circuits have vindicated such awards.[49] Those decisions, however, bear no relevance to the instant case. The Code of Professional Responsibility permits a lawyer to divide fees with or distribute them to other members of his "law firm or law office,"[50] and we see no reason why this authorization should not extend to pub-

---

**42.** See text *supra* at notes 18–21.

**43.** See *Wilderness Soc'y v. Morton, supra* note 39, 161 U.S.App.D.C. at 457, 495 F.2d at 1037.

**44.** *Copeland v. Marshall, supra* note 12, 205 U.S.App.D.C. at 393 n.1, 410, 641 F.2d at 883 n.1, 900.

**45.** *Wilderness Soc'y v. Morton, supra* note 39, 161 U.S.App.D.C. at 457, 495 F.2d at 1037.

**46.** Neither appellant nor amici have challenged our decision on statutory or constitutional grounds, or suggested that our result will have any anticompetitive effect on the practice of law.

**47.** Appellant's Supplemental Memorandum in Support of Suggestion for Rehearing En Banc at 2.

**48.** Brief for Amici Lawyers' Committee for Civil Rights Under Law and the Washington Lawyers' Committee for Civil Rights Under Law at 2–3.

**49.** See *Palmigiano v. Garrahy*, 616 F.2d 598, 602 (1st Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980); *Torres v. Sachs*, 538 F.2d 10, 13 (2d Cir. 1976); *Rodriguez v. Taylor*, 569 F.2d 1231, 1245 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1148 (4th Cir. 1975); *Fairley v. Patterson*, 493 F.2d 598, 607 (5th Cir. 1974); *Incarcerated Men of Allen County Jail v. Fair*, 507 F.2d 281, 286 (6th Cir. 1974); *Hairston v. R & R Apartments*, 510 F.2d 1090, 1092 (7th Cir. 1975); *Oldham v. Ehrlich*, 617 F.2d 163, 168–169 (8th Cir. 1980); *Brandenburger v. Thompson*, 494 F.2d 885, 887 (9th Cir. 1974).

**50.** ABA Code of Professional Responsibility, *supra* note 24, DR 2–107.

lic as well as private legal practitioners.[51] The same principle leaves a salaried attorney at liberty to surrender his fees to a public interest organization dedicated entirely to litigative activities.[52]

These results, we think, are firmly rooted in sound policy. As the Third Circuit has noted,

> [t]he award of fees to legal aid offices and other groups furnishing *pro bono publico* representation promotes the enforcement of the underlying statutes. . . . Legal services organizations often must ration their limited financial and manpower resources. Allowing them to recover fees enhances their capabilities to assist in the enforcement of congressionally favored individual rights.[53]

Other courts across the country are in accord.[54] We ourselves have observed that full-fee allowances to public interest law firms may be necessary to effectuate the "private attorney's general" concept implicit in much of Congress' antidiscrimination legislation.[55] Indeed, Congress itself has sanctioned such awards, at least in the civil rights area, for, as the Supreme Court recently observed, "Congress [has] endorsed . . . decisions allowing fees to public interest groups when it was considering, and passed, the Civil Rights Attorney's Fees Awards Act of 1976[56] . . . which is legislation similar in purpose and design to Title VII's fee provision."[57] The important consideration is that in these instances the fees are plowed back into the litigative programs that made their recovery possible in the first place.

Here, in contrast, there is no hint whatsoever that the sought-after fees would be similarly devoted. So far as we know, they would go toward enrichment of the union's coffers and support of its diverse operations. The amount over and above the union's actual cost, we reemphasize, would be a profit on the legal services generating the fees. The ethical exception for fee-splitting within a law office[58] obviously is not applicable, and the policies endorsed by Congress

---

51. See *Copeland v. Marshall, supra* note 12. 205 U.S.App.D.C. at 409, 641 F.2d at 899.

52. *Cf. Application of Community Action for Legal Serv., Inc.*, 26 App.Div.2d 354, 274 N.Y. S.2d 779 (N.Y.Sup.Ct.1966) (corporation may practice law if it is entirely controlled by lawyers, though non-lawyers may sponsor the organization); American Bar Association, Recent Ethics Opinions, No. 334 (Aug. 10, 1974) (lawyers employed by legal services offices must be free to exercise independent professional judgment); H. Drinker, *supra* note 26, 34–38 (attorney is less likely to engage in unethical conduct because subject to the profession's ethical rules).

53. *Rodriguez v. Taylor, supra* note 49, 569 F.2d at 1245.

54. *Palmigiano v. Garrahy, supra* note 49, 616 F.2d at 602; *Torres v. Sachs, supra* note 49, 538 F.2d at 13; *Incarcerated Men of Allen County Jail v. Fair, supra* note 49, 507 F.2d at 286; *Hairston v. R & R Apartments, supra* note 49, 510 F.2d at 1092; *Oldham v. Ehrlich, supra* note 49, 617 F.2d at 168–169.

55. *Copeland v. Marshall, supra* note 12, 205 U.S.App.D.C. at 409, 641 F.2d at 899.

56. Pub.L.No. 94–559, § 2, 90 Stat. 2641 (1976), 42 U.S.C. § 1988 (1976).

57. *New York Gaslight Club v. Carey*, 447 U.S. 54, 70–71 n.9, 100 S.Ct. 2024, 2034 n.9, 64 L.Ed.2d 723, 738 n.9 (1980). Among the cases that Congress cited with approval were *Fairley v. Patterson, supra* note 49, where, with respect to attorneys employed by the Lawyers Committee for Civil Rights Under Law, 493 F.2d at 606 n.12, the Fifth Circuit stated that "[w]hether the attorney charges a fee or has an agreement that the organization that employs him will receive any awarded attorneys' fees are not bases on which to deny or limit attorneys' fees or expenses," *id.* at 607; and *Davis v. County of Los Angeles*, 8 E.P.D. § 9444 (C.D.Calif. 1974), where the court declared that "it is not legally relevant that plaintiffs' counsel . . . are employed by . . . a privately funded non-profit law firm. It is in the interest of the public that such law firms be awarded reasonable attorneys' fees to be computed in the traditional manner. . . ." *Id.* at §§ 9444–9445. See S.Rep.No. 1011, 94th Cong., 2d Sess. 6 U.S. Code Cong. & Admin.News 1976, p. 5908; H.R. Rep.No. 1416, 93d Cong., 2d Sess. 17. The House expressed its hope that the new fee provision would help to relieve the shortage of resources burdening the "civil rights bar." *Id.* at 3.

58. See text *supra* at note 50.

and the courts [59] are not implicated. As we have noted, full-fee awards are appropriate when the monies are to become the attorneys' own; [60] perhaps, too, such allowances would withstand criticism when the monies are directed into a fund for maintenance of a legal services program. [61] But the first of these situations is certainly not the one before us, nor from aught that appears is the second.

## B. *The Impact of Copeland v. Marshall: Of Apples and Oranges*

In *Copeland*, we held that attorney's fee awards in Title VII litigation were to be computed on the basis of the market value of the services rendered the client. [62] While the awardees there were attorneys associated with a private for-profit law firm, we made clear that our holding applied equally to lawyers employed in public interest law offices. [63] This, the union argues, is at war with our conclusion today.

The answer, once again, is that the instant case is simply not *Copeland* reincarnated. The distinguishing wrinkle here is that above-cost fees are requested by a lay organization, a circumstance interposing grave ethical difficulties not arising in *Copeland*, where market-value fees were sought for the attorneys themselves. There thus was no occasion in *Copeland* for operation of the well-entrenched ethical principles blocking the union's way in the case at bar. [64] With no overriding facet of law or policy evident, we think our decision should indulge these principles their accustomed sway.

We do not imply, of course, that Congress could not assign the considerations at stake values different from those ascribed by the legal profession. It suffices merely to observe that for cases like the one before us, Congress has not done so. It is noteworthy that the *Copeland* fee award was for services rendered in an employment discrimination action, and that some of our most telling arguments for a market-value allowance—the private enforcement scheme of Title VII [65] and congressional affirmation of fee grants to public interest law firms [66] —were grounded in a perceived need for widespread citizen-litigation to translate a broad governmental goal into reality. [67] The instant suit, by contrast, involves the Privacy Act, which lacks any comparable background, and the attorney's fee provision of which [68] has the comparatively modest function of removing disincentives to the prosecution of individual actions. [69]

Our holding, then, is very narrow. We deem it crucial that market-value attorney's fees are sought here, not by a private law firm or its public counterpart, but by a lay organization, to enable it to turn a profit on what distinctly was lawyers' work. We decide no more than that an above-cost allowance in these circumstances would be improper, and that the organization must be limited to recovery of the expense to which it was put in supplying the legal services in question. We remand the case to the District Court for computation and award of the amount thus due the union. [70]

*So ordered.*

59. See text *supra* at notes 56–57.

60. See text *supra* at note 42.

61. In the circumstances here, we need intimate no view in this regard.

62. *Copeland v. Marshall, supra* note 12.

63. 205 U.S.App.D.C. at 408–410, 641 F.2d at 898–900.

64. See Part I *supra*.

65. *Copeland v. Marshall, supra* note 12, 205 U.S.App.D.C. at 409, 641 F.2d at 899.

66. *Id.* at 409, 410, 641 F.2d at 899, 900.

67. See H.R.Rep.No. 1558, 94th Cong., 2d Sess. 1, 3 (1976); S.Rep.No. 1011, 94th Cong., 2d Sess. 2 (1976).

68. Quoted *supra* note 17.

69. See H.R.Rep.No. 1416, 93d Cong., 2d Sess. 17 (1974). See also S.Rep.No. 1183, 93d Cong., 2d Sess. 83 (1974).

70. See *Anderson v. United States Dep't of Treasury, supra* note 8, text at note 44.

TAMM, Circuit Judge, concurring in the result:

Although the court's holding may be "very narrow," at 855, I question the creation of a rich vein of dicta for the delight of future prospectors of the law. I concur in the result reached by the court.

On Suggestion for Rehearing En Banc
(D.C. Civil Action No. 76–1404).

Before ROBINSON, Chief Judge, and WRIGHT, McGOWAN, TAMM, MacKINNON, ROBB, and WILKEY, Circuit Judges

## ORDER

PER CURIAM.

Appellant's suggestion for rehearing *en banc*, the letter received from counsel for appellee (Justice) pursuant to Rule 28(j), Federal Rules of Appellate Procedure, and appellant's supplemental memorandum in support of its suggestion for rehearing *en banc*, having been transmitted to the full Court and no judge in regular active service having requested a vote with respect thereto, it is

ORDERED, by the Court, *en banc*, that appellant's aforesaid suggestion for rehearing *en banc* is denied.