**James H. CURRAN, Petitioner,**

v.

**DEPARTMENT OF the TREASURY, Respondent.**

No. 85–7420.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 30, 1986.

Decided Dec. 15, 1986.

Lois G. Williams, Nat. Treasury Employees Union, Washington, D.C., Andrew R. Krakoff, Nat. Treasury Employees Union, Oakland, Cal., for petitioner.

M. Susan Burnett, Asst. Director, Commercial Litigation Branch, Justice Dept., Dept. of Treasury, Washington, D.C., for respondent.

Before SCHROEDER, POOLE, and NORRIS, Circuit Judges.

SCHROEDER, Circuit Judge.

This is an attorney fee coda to petitioner's successful effort to win reinstatement by the Department of the Treasury to his position as a special agent with the Customs Service. We held in 1983 that the Merit Systems Protection Board's (MSPB or Board) decision sustaining James H. Curran's discharge was not supported by substantial evidence. *Curran v. Department of the Treasury*, 714 F.2d 913, 918 (9th Cir.1983). We further stated that attorney fees appeared appropriate under the Back Pay Act for correction of the unjustified personnel action. *Id.* The matter is now back to us to review the Board's fee order.

Petitioner at all times has been represented by attorneys employed by his union, the National Treasury Employees Union (NTEU). The Board awarded fees, not on the basis of the prevailing market rate for time spent by the three NTEU attorneys who worked on the case, but, rather, based on the lawyers' actual hourly salary at the time the services were rendered. 26 MSPR 306. The main issue for us to decide is whether the Board properly held that ethical considerations precluded an award under the Back Pay Act of market rate attorney fees to the union's legal services fund.

This court, not the United States Court of Appeals for the Federal Circuit, has jurisdiction because we have concluded that the matter was pending in our circuit on October 1, 1982, the cutoff date for the transfer of MSPB appeals to the Federal Circuit under the Federal Courts Improvement Act § 402, 28 U.S.C. § 171 note (1982) (indicating effective date of 1982 amendment); 5 U.S.C. § 7703(b)(1), (d) (1982) (vesting exclusive jurisdiction to review MSPB decisions in Federal Circuit). *See Miller v. United States*, 753 F.2d 270, 272 (3d Cir.1985) (exercising jurisdiction over fee issue after remand and after effective date of Act); *Morris Mechanical Enter-*

*prises, Inc. v. United States*, 728 F.2d 497, 498 (Fed.Cir.) (treating fee issue as "transition" matter and part of single case), *cert. denied*, 469 U.S. 1033, 105 S.Ct. 503, 83 L.Ed.2d 395 (1984).

The Back Pay Act authorizes "reasonable attorney fees" when an agency employee has prevailed and the fees are warranted in the interest of justice. 5 U.S.C. §§ 5596(b)(1)(A)(ii); 7701(g)(1) (1982). This standard of reasonableness is identical to that adopted by Congress in other statutes providing for litigation against the government, including the Privacy Act, 5 U.S.C. § 552a(g)(3)(B) (1982) (reasonable attorney fees and other litigation costs available to substantially prevailing complainant), and the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E) (1982) (reasonable attorney fees and costs assessable against United States when complainant substantially prevails).

There is no question in this case that the petitioner has prevailed, that an award of attorney fees is in the interest of justice, and that the number of hours claimed to have been spent both in the agency and judicial proceedings in the underlying case is reasonable. There also is no dispute that the fees awarded will be paid directly into a special fund, the NTEU's Legal Services Program, to support the litigation of individual and collective federal employee rights before administrative and judicial tribunals. The funds will not go into the union's general treasury. The question is whether we should award attorney fees at a market rate as claimed by appellant's counsel, or at a lower rate as awarded by the Board based upon the actual hourly salary of the attorneys performing the services.

The dispute in this case has its roots in a 1981 decision of the United States Court of Appeals for the District of Columbia Circuit, *NTEU v. Department of the Treasury*, 656 F.2d 848 (D.C.Cir.1981). In *NTEU*, lawyers employed by the union had successfully represented an employee in an action against the Department of the Treasury under the Privacy Act. *Id.* at 849.

At that time, no separate litigation fund existed and any fees generated by work of the union counsel were paid into the union's general treasury. The D.C. Circuit stated that the fee provisions of the Privacy Act should be read against the background of relevant ethical considerations regarding receipt of legal fees by non-lawyers. *Id.* at 851–52. Citing the Model Code of Professional Responsibility DR 3–101(A), 3–102 (1976), *id.* at 851 nn. 33, 34, the court held that the union was not entitled to market rate fees which would total more than its actual cost in supplying the legal services. 656 F.2d at 853.

The problem, as the D.C. Circuit saw it, was an ethical one: payment for legal services should not result in a profit for a lay organization. The court recognized that legal aid offices and public interest organizations offering pro bono legal services have long been awarded market rate fees to promote the enforcement of the underlying statutes authorizing the fees. *Id.* at 853–54. This is a principle the Supreme Court has now endorsed in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (awarding market rate fees to non-profit counsel under 42 U.S.C. § 1988). The D.C. Circuit in *NTEU* noted that when fees are "plowed back into the litigative programs that made their recovery possible in the first place," no ethical problem exists. 656 F.2d at 854. The court then observed in dicta that market rate fees for attorneys salaried by lay organizations might be ethically acceptable "when the monies are directed into a fund for maintenance of a legal services program." *Id.* at 855.

Taking its lead from the D.C. Circuit's suggestion in *NTEU*, the union created its Legal Services Program in 1981. The program supports litigation and is maintained as a segregable item in NTEU's accounts. The D.C. Circuit's subsequent opinion in

*Jordan v. Department of Justice*, 691 F.2d 514 (D.C.Cir.1982), further encouraged the establishment of such programs. There, the court awarded prevailing market rates to a university-affiliated law institute under the Freedom of Information Act. *Id.* at 515–17, 525. Citing its decision in *NTEU*, the court noted that should the institute, which it treated as a lay entity, share in the attorney fee award beyond recoupment of its own expenses, the court would assume the institute would maintain a fund exclusively for litigation. *Id.* at 516 n. 14. Under the standards applied by the D.C. Circuit, a separate litigation fund like the one presented here satisfies the ethical concerns expressed in *NTEU* and removes any barrier to the payment of market rates. *See also Johnson v. Department of the Treasury*, No. SA–77–CA–5, slip op. at 9 (W.D.Tex. Sept. 24, 1981) (concluding NTEU's newly created Legal Services Program cured D.C. Circuit's ethical concerns in *NTEU*), *rev'd on other grounds*, 700 F.2d 971 (5th Cir.1983).

█ We agree with the D.C. Circuit that a separate operating account for legal services provides sufficient protection against the unauthorized practice of law by a lay organization.[1] The Model Code's proscription against the sharing of legal fees with a non-lawyer, Canon 3, is to prevent encouraging persons who are not authorized to practice law to engage in the unauthorized practice of law. ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1519 (1986). The rationale is that

the public interest is best served by assuring that clients are represented by lawyers who, as members of a regulated profession, are an arm of and subject to the courts, are committed to court-approved standards of ethical and professional conduct, are not subject to conflicting interests or divided loyalties and are

---

1. This court has never considered whether we would agree with the D.C. Circuit that a separate fund actually is required. Because we hold in this case that such a requirement has been satisfied, we need not address the issue and expressly reserve it. We observe that the government has never argued that we should treat unions differently than any other lay organization. A requirement that all lay entities, including for-profit corporations using house counsel, must establish separate litigation funds before being compensated at market rate is sweeping and appears unprecedented in the arena of ethical standards.

protected against possible control by others in the exercise of their professional judgment.

*Id.* (citing EC 3–3; Model Rules of Professional Conduct Rule 5.4 comment (1983)). *See also NTEU,* 656 F.2d at 852 n. 37 (citing EC 3–1, 3–3, 3–8). The California courts have stated that the rationale for the fee-splitting rule is to protect against "the possibility of control by the lay person, interested in his own profit rather than the client's fate." *Gassman v. State Bar,* 18 Cal.3d 125, 132, 553 P.2d 1147, 1151, 132 Cal.Rptr. 675, 679 (1976) (quoting *Emmons, Williams, Mires & Leech v. State Bar,* 6 Cal.App.3d 565, 573–74, 86 Cal.Rptr. 367, 372 (1970)).

▇ In this case, the government has not suggested that non-lawyer officials of NTEU exercise any control over NTEU's litigation. When fees are paid into a separate account used solely by lawyers for litigation purposes, there simply is no fee splitting with a lay entity and no encouragement of the unauthorized practice of law. We therefore perceive no ethical barrier to compensation at market rate.

The MSPB has taken a contrary view. The Board, shortly after the D.C. Circuit's ruling in *NTEU,* held that union-employed counsel obligated to turn their fee award over to the union's general treasury must be compensated based on a salary-plus-overhead computation. *Powell v. Department of the Treasury,* 8 M.S.P.B. 21, 27 (1981). The next year, however, when faced with a case in which the fees would go into a separate litigation fund, the Board refused to follow the D.C. Circuit's lead. The Board held that notwithstanding the litigation fund, a fee award in excess of actual cost was inappropriate. *Wells v. Schweiker,* 12 M.S.P.B. 329, 332 (1982) (denying market rate fees to American Federation of Government Employees' litigation

fund). It reasoned that such an award "would relieve petitioner of the burden of financing its litigation activities through its general revenue funds" and thereby unethically profit from the underlying activities of its attorneys. *Id.* This reasoning has been approved by the Federal Circuit. *Devine v. NTEU,* 805 F.2d 384 (Fed.Cir.1986); *Goodrich v. Department of the Navy,* 733 F.2d 1578 (Fed.Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 965 (1985).

The theory which the government proffers for accepting the view of the Board in this case, and rejecting that of the D.C. Circuit, is that an award of market rate fees to a separate litigation fund creates an "indirect benefit" to any lay organization contributing to the fund. It reasons that if the fund receives more than its cost, then a lay organization will not have to contribute money from its own funds to finance litigation at the same level.[2] This is true, according to the government, even where a lay organization like NTEU here has no obligation to fund the litigation. The government cites no ethical authority in support of its position. The D.C. Bar Committee on Legal Ethics, Op. 176 (1986), has recently concluded that any indirect benefit accruing to a union from an award of market rate fees to its separate litigation fund does not encourage laymen to practice law and does not compromise the attorneys' independent professional judgment. We also fail to see how such an indirect benefit encourages the unauthorized practice of law. Although the prospect of indirect benefits through successful litigation might encourage lay organizations to litigate more meritorious cases, they would still necessarily rely on attorneys to conduct the litigation. Moreover, an indirect benefit from an above-cost fee award would accrue to any contributor to a pro

---

**2.** The Board's assumption that an above-cost fee award will *always* provide an indirect economic benefit to the non-legal activities of a lay organization is incorrect. Whether or not a particular lay organization will in fact receive an indirect economic benefit for its lay activities as a result of the "freeing up" of monies it otherwise would have spent for litigation turns on many

factors. Although an organization may choose to divert its original contribution of general revenues for litigation to support an expansion of its lay activity, it may choose to instead maintain its original contribution and simply add this amount to any fees awarded to the litigation fund as a means of financing greater legal activity.

bono legal project receiving such an award. This would include contributors to the Legal Aid Society of New York, to which the Supreme Court approved an award of market rate fees in *Blum*, 465 U.S. at 890, 901–02, 104 S.Ct. at 1544, 1550.

■ The government also argues that, even if we are inclined to disagree with the Board and the Federal Circuit, we should nevertheless defer to those institutions insofar as they are interpreting a provision of the Back Pay Act, which is now exclusively entrusted to their jurisdiction. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969) (court should sustain construction of statute by agency charged with its execution unless there are "compelling indications" that it is wrong); *Bennett v. Department of the Navy*, 699 F.2d 1140, 1146 (Fed.Cir.1983) (applying principles of deference to MSPB's implementation of its statutory authority to direct payment of attorney fees). Our difficulty with this position is that this case does not involve statutory interpretation of the Back Pay Act. Rather, it involves a question of ethical considerations which would apply to fee awards without regard to the particular statute involved. The statutory standard of "reasonable attorney fees" in the Back Pay Act is identical to that in other statutes. We see no reason to place different ethical obligations upon lawyers seeking fees under the Back Pay Act, 5 U.S.C. § 5596(b)(1)(A)(ii) (1982), from those seeking fees under the Freedom of Information Act, *id.* at § 552(a)(4)(E), the Privacy Act, *id.* at § 552a(g)(3)(B), the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(1)(A) (1982), or the Civil Rights Act, 42 U.S.C. § 1988 (1982). *See also Devine v. Sutermeister*, 733 F.2d 892, 899–900 (Fed.Cir.1984) (awarding market rate fees to NTEU's Legal Services Program under EAJA without discussion of ethical considerations). A congressional decision to concentrate administrative or judicial decision making in specialized agencies or courts should not result in the atomization of the law with respect to attorneys' obligations toward their clients.

Because we conclude that market rate fees are available under the Back Pay Act, we need not address appellant's alternative legal theories. The appellant has renewed his request for attorney fees for the earlier appeal, as we indicated he should in our opinion at 714 F.2d at 918. That request for $10,127.24 is granted. The order of the Board is reversed and the matter is remanded for the entry of a fee award in accordance with this opinion for services rendered during the administrative proceedings.