United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 18, 1997 Decided February 27, 1998 

 No. 97-7040

 Board of Trustees of the Hotel and Restaurant Employees 

 Local 25 and Employers' Health and 

 Welfare Fund, et al. 

 Appellants

 v.

 JPR, Inc., 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cv01028)

 Daniel M. Katz argued the cause and filed the briefs for 
appellants. Ellen G. Ranzman entered an appearance.

 Malcolm L. Pritzker argued the cause and filed the brief 
for appellee. Steven R. Semler entered an appearance.


 Before: Edwards, Chief Judge, Wald and Randolph, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Opinion concurring in part and dissenting in part filed by 
Circuit Judge Randolph.

 Wald, Circuit Judge: This appeal is brought by the Boards 
of Trustees of two employee benefit plans, (1) the Hotel and 
Restaurant Employees Local 25 and Employers' Health and 
Welfare Fund, and (2) the Hotel and Restaurant Employees 
Local 25 and Hotel Association, Cafeteria and Other Sub-
scribing Employers Group Legal Services Fund. (We will 
refer to the two plans as "the Funds," and to their Boards of 
Trustees collectively as "the Trustees.") The Trustees pre-
vailed in an action in the district court in which they sought to 
collect underpayments to the Funds by JPR, Inc. ("JPR"), 
the entity that operates the Washington, D.C. restaurant La 
Colline. In addition to recovering the shortfall in payments, 
they collected interest, liquidated damages, litigation ex-
penses, and attorney's fees. The district court declined, 
however, to award the Trustees auditing fees, and awarded 
attorney's fees only at the rate actually charged, rather than 
at market rates. The Trustees appeal these two rulings. We 
affirm the first, but reverse the second, finding that the 
district court must consider whether the fees charged by the 
Trustees' attorney incorporated a public-spirited discount, 
and, if so, award fees at market rates.

 I. Background

 The Funds were established by agreement between Local 25 
of the Hotel & Restaurant Employees Union ("the Union") 
and the Hotel Association of Washington, D.C. (the "Hotel 
Association"); the Trustees who administer the Funds are 
drawn from representatives of both parties. The Union 
represents a bargaining unit of employees of La Colline, and 
JPR is a member of the Hotel Association. The collective 


bargaining agreement between the Union and JPR requires 
JPR to make a specified contribution to the Funds for every 
hour worked by an employee.

 The documents establishing the Funds are called the "Den-
tal and Optical Care Plan Trust Agreement" 1 and the "Group 
Legal Services Plan Trust Agreement." Each of these agree-
ments requires participating employers to make contributions 
to the appropriate Fund, and permits the Trustees of that 
Fund to audit employers' records in order to ensure that the 
correct contributions have been made. The Trustees periodi-
cally conduct routine audits of participating employers to 
assure that they are making the appropriate contributions.

 This case arises out of such a routine audit, that of JPR's 
contributions to the Funds from 1992 to 1994. The audit 
revealed a total shortfall of $36,162.88. The Trustees at-
tempted to persuade JPR to pay this sum voluntarily, and 
then filed suit to compel JPR to do so, bringing claims under 
the Employee Retirement Income Security Act ("ERISA") 
and the National Labor Relations Act. JPR raised three 
affirmative defenses: first, that no payments were due for 
employees in their first three months of employment; second, 
that some of the employees were covered by other insurance 
and that no contributions were needed on their behalf; and 
third, (in a variation of the second argument) that it need not 
make contributions for dental insurance which it asserted was 
duplicative. The Trustees moved for summary judgment, 
and the district court granted the motion, finding none of 
JPR's defenses to be meritorious. JPR did not appeal this 
ruling.

 ERISA provides that "in any action under this subchapter 
by a fiduciary for or on behalf of a plan to enforce section 
1145 of this title in which a judgment in favor of the plan is 
awarded, the court shall award the plan" an enumerated list 
of elements of damages. 29 U.S.C. s 1132(g)(2) (1994). The 

__________
 1 The title of this agreement reflects the former name of the 
Health and Welfare Fund.


Trustees' action was within this section, as it was brought, 
inter alia, to enforce 29 U.S.C. s 1145, a provision that 
relates to delinquent contributions.2 Accordingly, in addition 
to recovering the overdue amount, the Trustees sought, and 
the district court awarded, (1) interest (at 18%), (2) duplicate 
interest in lieu of liquidated damages, (3) litigation expenses, 
and (4) attorney's fees.

 The district court declined, however, to award $9,066 in 
audit fees sought by the Trustees. The Trustees also argued 
that the amount of attorney's fees charged by their counsel, 
$17,775, reflected a large charitable discount from market 
rates, and that they should receive an award at the market 
value of their counsel's legal services, which they claimed was 
$43,068.75. The district court did not accept this argument, 
and awarded only the actual amount of fees charged. These 
two decisions are now before us on appeal.

 II. Analysis 

 We have often been warned that "[a] request for attorney's 
fees should not result in a second major litigation." Hensley 
v. Eckerhart, 461 U.S. 424, 437 (1983). Clearly, the district 
court is most familiar with the interstices of the litigation, and 
we accord its decisions considerable deference. See id. at 
437. Our review of its fee awards is confined to correcting 
errors of law and remedying abuses of discretion. See Cov-
ington v. District of Columbia, 57 F.3d 1101, 1110 (D.C. Cir. 
1995); see also Pierce v. Underwood, 487 U.S. 552, 571 (1988) 
(stating that "it is well established that the abuse-of- 
discretion standard applies" to review of a district court's 
award of fees).

__________
 2 Section 1145 provides: "Every employer who is obligated to 
make contributions to a multiemployer plan under the terms of the 
plan or under the terms of a collectively bargained agreement shall, 
to the extent not inconsistent with law, make such contributions in 
accordance with the terms and conditions of such plan or such 
agreement." 29 U.S.C. s 1145 (1994). The Funds are multiem-
ployer plans.


A. Audit Fees

 The Trustees sought two types of audit fees in the district 
court: (1) the costs of the routine audit that discovered JPR's 
shortfall in payments, and (2) fees for 24 hours of work 
performed in connection with the merits of the delinquency 
litigation before the district court. The district court denied 
both categories of audit fee, for reasons that we conclude 
were correct.

 1. Costs of the Routine Audit

 The Trust Agreement establishing the Health and Welfare 
Fund contains a provision entitled "Default and Payment" 
which provides that, in the event of "failure to pay such 
monthly contributions in full within the time above provided,"

 any person in default may be required at the discretion 
 of the Trustees to pay as liquidated damages such 
 amounts as the Trustees may determine, including inter-
 est up to the maximum permitted by law, together with 
 all expenses of collection incurred by the Trustees, in-
 cluding, but not limited to reasonable counsel fees, audit-
 ing fees, and court costs, and any other lawful charges 
 for late payment as the Trustees may determine.

The Trust Agreement establishing the Legal Services Fund 
contains a provision that is, for our purposes, identical (it 
contains minor differences of wording). Because the two 
provisions are equivalent, we will refer to them together as 
"the" Default and Payment Clause.

 ERISA requires that "[e]very employer who is obliged to 
make contributions to a multiemployer plan ... make such 
contributions in accordance with the terms and conditions of 
such plan ...," 29 U.S.C. s 1145 (1994), and permits Plan 
fiduciaries to bring suit to "enforce ... the terms of the 
plan." 29 U.S.C. s 1132(a)(3) (1994). Thus, if the Default 
and Payment Clause requires employers who are in default to 
pay routine auditing fees, ERISA empowers the Trustees to 
enforce that requirement. See Iron Workers District Council 
v. Hudson Steel Fabricators & Erectors, Inc., 68 F.3d 1502, 
1507 (2d Cir. 1995). The district court concluded that the 


Default and Payment Clause did not include such a require-
ment, and hence declined to award routine auditing fees.

 We review questions of the proper interpretation of ERISA 
plans de novo. See Carey Canada, Inc. v. Columbia Cas. Co., 
940 F.2d 1548, 1554 (D.C. Cir. 1991). The Trustees point to 
the Default and Payment Clause's statement that they may 
collect "all expenses of collection incurred by the Trustees, 
including, but not limited to reasonable counsel fees, auditing 
fees, and court costs," and argue that this allows them to 
collect all auditing fees, including the costs of the routine 
audit that discovered an underpayment. We do not think so. 
This passage only permits the Trustees to recoup those 
"auditing fees" that qualify as "expenses of collection." An 
"expense of collection," as that phrase is usually understood, 
is an expense that results from collection efforts. The Trust-
ees have pointed to no evidence that this phrase means 
something different here. The fact that the Default and 
Payment Clause also lists "reasonable counsel fees" and 
"court costs" as types of "expenses of collection" confirms our 
reading; both are costs that are only incurred as a result of 
collection efforts. (This is an application of ejusdem generis, 
the canon of construction that states that "a general statutory 
term should be understood in light of the specific terms that 
surround it." Hughey v. United States, 495 U.S. 411, 419 
(1990).)

 This is not to say that auditing fees may never qualify as 
"expenses of collection." Fees for non-routine follow-up au-
dits performed as a part of the collection process are clearly 
included in the term. An audit that began as routine might 
also abruptly change its stripes and become a non-routine 
audit, if auditors discovered inconsistencies during their work 
and did extra work to untangle them. Because such detective 
work would be motivated by the desire to collect an under-
payment, rather than by the need to perform a routine audit, 
it could fairly be called an "expense of collection." There is 
no allegation of this kind here, however; the Trustees' audit 
of JPR seems to have cost no more than would a routine audit 


of any other employer.3

 The Fifth Circuit has construed a similar plan provision--
which also allowed the Trustees to recover all "expenses of 
collection"--to allow reimbursement of routine audit fees. 
See Carpenters Amended and Restated Health Benefit Fund 
v. Ryan Constr. Co., 767 F.2d 1170, 1175 (5th Cir. 1985). 
Ryan found that the costs of the routine audit were "ex-
penses of collection" because an audit is "a necessary first 
step in collection of any delinquency." Id. at 1175-76. We 
believe the reasoning of Ryan proves too much. By Ryan 's 
logic, the Trustees should also be able to put in for a host of 
other expenses that are "necessary" to the initiation of collec-
tion efforts, i.e., the cost of their own salaries, as collection 
efforts are impossible without effective supervision of the 
auditors and of the Funds' finances. The test is not whether 
an expenditure is a necessary precondition to collection ef-
forts, but rather the reverse, whether collection efforts 
prompted the expenditure.4

 2. Litigation-Related Auditing Expenses

 The district court declined to grant the Trustees' request 
for reimbursement for 24 hours of litigation-related auditing 

__________
 3 The Trustees argue that JPR's unusual recordkeeping practices 
increased the costs of the routine audit. But there is no indication 
that JPR adopted its recordkeeping practices in order to conceal 
underpayments, or that there is any other link between those 
practices and JPR's underpayment.

 4 The Default and Payment Clause also states that "any person in 
default may be required at the discretion of the Trustees to pay as 
liquidated damages such amounts as the Trustees may deter-
mine...." The Trustees have not argued that this language enti-
tles them to recover routine audit fees, and we therefore have not 
considered that question. Nor have the Trustees claimed that they 
should have received audit fees under ERISA's provision permitting 
the court to award "such other legal or equitable relief as the court 
deems appropriate." 29 U.S.C. s 1132(g)(2)(E); see also Operating 
Engineers Pension Trust v. A-C Co., 859 F.2d 1336, 1342-43 (9th 
Cir. 1988) (finding that audit fees may be awarded under this 
provision).


expenses, finding that the hours spent were "more in the 
nature of litigation support than audit services, ... and in 
any event are inadequately supported." We find that the 
district court was within its discretion in concluding that this 
request for reimbursement was inadequately supported. We 
therefore do not consider whether litigation support services 
are compensable under section 1132(g)(2). But cf. Missouri 
v. Jenkins, 491 U.S. 274, 285 (1989) (finding that an award of 
a "reasonable attorney's fee" under 42 U.S.C. s 1988 may 
include the services of paralegals).

 A plaintiff seeking attorney's fees under section 1983 must 
demonstrate that the hours billed were reasonably expended 
in pursuit of the litigation. "Counsel for the prevailing party 
should make a good-faith effort to exclude from a fee request 
hours that are excessive, redundant, or otherwise unneces-
sary, just as a lawyer in private practice ethically is obligated 
to exclude such hours from his fee submission." Hensley, 461 
U.S. at 434. "[I]f the district court finds that the attorney 
failed to exercise billing discretion with respect to any of the 
hours [claimed], the court may reject those hours as not 
reasonably expended." Goos v. National Association of Re-
altors, 68 F.3d 1380, 1387 (D.C. Cir. 1995). The weaker the 
apparent need for a particular activity, the higher the eviden-
tiary hurdle a claimant must cross in order to demonstrate 
that it was in fact performed in a reasonable effort to pursue 
the litigation.

 The Trustees have failed to meet this standard of reason-
ableness. Sixteen hours of the twenty-four were consumed in 
preparing for the Trustees' summary judgment motion, most-
ly on two declarations. The Trustees have not attempted to 
provide us with any explanation of the need for these declara-
tions, and their purpose is not obvious, given that the results 
of the audit appear not to have been in controversy. The 
remaining eight hours were used to compile two tables, one 
calculating the interest due on JPR's underpayments, and the 
other listing the hours of work performed by particular 
auditors and their hourly rates. Although the purpose of 
these tables is more clear, it is incomprehensible that their 
preparation could have consumed anywhere near eight hours. 


The appropriate course in such circumstances is often to 
allow a part of the requested time. Here, however, the 
allowable amount of time--perhaps two hours--would be de 
minimus, especially when considered in relation to the Trust-
ees' fee request as a whole. Accordingly, we see no need to 
disturb the district court's decision to disallow this claim 
altogether.

B. Attorney's Fees

 The Trustees argued before the district court that their 
attorney's hourly rate had been substantially discounted for 
public-spirited reasons, and that they were therefore entitled 
to an award of fees based on the market value of the services 
he performed, not on the amount that he actually charged. 
They asserted that the market value of their attorney's 
services is $43,068.75, and sought an award in that amount. 
The Trustees' attorney said at oral argument that the Funds 
would remit to him any amount awarded in excess of his 
actual fees.5

 The district court concluded that, despite some authority 
permitting plaintiffs to recover fees at market rates even if 
they actually paid their counsel lesser amounts, see, e.g., 
Covington, 57 F.3d at 1107, such an exception is limited to 
awards of fees under 42 U.S.C. s 1988 (the governing statute 
in Covington), and does not apply to this case. Accordingly, 
the district court awarded only the amount actually charged 
by the Trustees' attorney, $17,775.

__________
 5 We therefore need not consider the potential applicability of 
National Treasury Employees Union v. United States Department 
of the Treasury, 656 F.2d 848 (D.C. Cir. 1981), which found, citing 
the restrictions on fee-splitting in the ABA's Code of Professional 
Responsibility, that it was impermissible to make an award of 
attorney's fees to a union in excess of the actual cost to the union of 
the attorney's services. See id. at 851-53; but cf. ABA Comm. on 
Ethics and Professional Responsibility, Formal Op. 93-374 (1993) 
(interpreting Model Rule of Professional Conduct 5.4 to permit the 
sharing of court-awarded fees for a pro bono representation be-
tween an attorney and a non-profit client).


 We begin by assuming that the Trustees' attorney, for 
public-spirited reasons, provided his services to the Trustees 
at a discount. Assuming this to be the case, we find the 
Trustees entitled to a fee award at the market value of their 
services, rather than at the actual rate they were charged. 
We then discuss how the district court is to decide whether 
the fee charged did in fact incorporate a public-spirited 
discount, and, if so, how it should determine the market rate 
in making the award in this case.

 1. Market Rate or Actual Rate?

 ERISA provides that, in actions to collect unpaid contribu-
tions in which the plan is successful, the court "shall award to 
the plan ... (D) reasonable attorney's fees and costs of the 
action, to be paid by the defendant." 29 U.S.C. s 1132(g)(2). 
The usual method of calculating reasonable attorney's fees is 
to multiply the hours reasonably expended in the litigation by 
a reasonable hourly fee, producing the "lodestar" amount. 
See Pennsylvania v. Delaware Valley Citizens' Council for 
Clean Air, 478 U.S. 546, 564 (1986) ("Delaware Valley" ). 
This amount may then be adjusted by a multiplier "in certain 
'rare' and 'exceptional' cases," see id. at 565 (quoting Blum v. 
Stenson, 465 U.S. 886, 898-901 (1984)), although there is a 
"strong presumption that the lodestar figure ... represents a 
'reasonable' fee." Id.

 The issue we are concerned with here is what constitutes a 
"reasonable hourly fee" for purposes of the lodestar calcula-
tion. This court held in Save Our Cumberland Mountains, 
Inc. v. Hodel, 857 F.2d 1516 (D.C. Cir. 1988) (in banc) 
("SOCM "), and reaffirmed in Covington, 57 F.3d at 1107, that 
a party whose attorney charges a discounted rate for public-
spirited reasons may nevertheless receive an award of fees at 
market rates. The rationale of those cases is not, as the 
district court concluded, limited to actions under section 1988; 
indeed, although SOCM drew extensively on the legislative 
history of section 1988, SOCM itself involved an award under 
a fee-shifting provision of the Surface Mining Control and 
Reclamation Act. SOCM applied section 1988 jurisprudence 
to the interpretation of this statute on the authority of 


Delaware Valley, in which the Supreme Court found that it 
was appropriate to apply section 1988 caselaw in construing a 
fee-shifting provision of the Clean Air Act because both 
provisions had as their "common purpose" to "promote citizen 
enforcement of important federal policies." 478 U.S. at 560; 
see also SOCM, 857 F.2d at 1519 n.1 (citing the panel opinion 
in that case, Save Our Cumberland Mountains, Inc. v. Hodel, 
826 F.2d 43, 47 (D.C. Cir. 1987), which in turn cited this 
passage of Delaware Valley ).

 Delaware Valley thus endorses the application of law devel-
oped under section 1988 to other fee-shifting provisions that 
have the same citizen-enforcement purpose. Since Delaware 
Valley, the Court has twice clarified when it is appropriate to 
apply caselaw developed under one fee-shifting provision to 
another such provision. First, in Independent Federation of 
Flight Attendants v. Zipes, 491 U.S. 754 (1989), the Court 
observed that "fee-shifting statutes' similar language is a 
strong indication that they are to be interpreted alike," and 
drew on caselaw under one fee-shifting provision of the Civil 
Rights Act of 1964 in interpreting another fee-shifting provi-
sion of the same statute. Id. at 758 n.2.

 Conversely, in Fogerty v. Fantasy, Inc., 510 U.S. 517 
(1994), the Court found that the "normal indication" of Zipes 
could be "overborne" if the factors that justify a fee-shifting 
rule in one context, such as the purpose or legislative history 
of a statute, are absent in another. Id. at 523. Fogerty 
involved the interpretation of 17 U.S.C. s 505, a fee-shifting 
statute applicable to copyright infringement actions. The 
wording of this provision is virtually identical to that of a fee-
shifting provision for Title VII of the Civil Rights Act of 1964, 
42 U.S.C. s 2000e-5(k). Under caselaw interpreting section 
2000e-5(k), there is a presumption that prevailing plaintiffs--
but not prevailing defendants--will receive an award of fees. 
See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 418 
(1978). But the Fogerty Court found that it was not appro-
priate to apply the section 2000e-5(k) presumption to section 
505, despite the similarity of language between the two 
provisions, because there was no indication in section 505's 
legislative history that Congress intended plaintiffs and de-


fendants to be treated differently for purposes of fee awards. 
The Court also concluded that the purpose of the Copyright 
Act--encouraging the production of creative works--is not 
obviously served by favoring plaintiffs over defendants in 
copyright infringement actions, especially given that "corpo-
rate behemoths" and "starving artists" are to be found among 
both the plaintiffs and the defendants in infringement actions. 
510 U.S. at 524 (citation omitted).

 The inquiry prescribed by Zipes, Fogerty and Delaware 
Valley does not differ that much from our usual processes of 
statutory interpretation. The first step, of course, is to 
consult the text of the statute; thus, Zipes' s rule that "fee-
shifting statutes' similar language is a strong indication that 
they are to be interpreted alike," 491 U.S. at 758 n.2. The 
next step is to consider the statute's purpose, structure, and 
legislative history; this explains Fogerty 's rule that the "nor-
mal indication" of Zipes can in some circumstances be "over-
borne" on the basis of contextual evidence. 510 U.S. at 523. 
Delaware Valley comes into play at this stage; it defines one 
category of statutes--those intended to "promote citizen en-
forcement of important federal policies," 478 U.S. at 560--as 
having a "common purpose" and therefore presumptively to 
be interpreted similarly. See Lyle v. Food Lion, Inc., 954 
F.2d 984, 988 n.1 (4th Cir. 1992) (citing Delaware Valley in 
applying section 1988 caselaw to a fee-shifting provision of the 
Fair Labor Standards Act).6

 Should our case fit securely within Delaware Valley, our 
analysis would be at an end, as SOCM would apply directly. 

__________
 6 Delaware Valley 's suggestion that a broad group of fee-shifting 
provisions should all be subject to the same set of legal standards 
may also have been based on the assumption that this would limit 
parties' incentives to litigate fee disputes. Cf. Hensley v. Ecker-
hart, 461 U.S. 424, 455 (1983) (Brennan, J., concurring in part and 
dissenting in part) (comparing appellate litigation of fee disputes to 
"a Frankenstein's monster" that "meanders its well-intentioned way 
through the legal landscape leaving waste and confusion (not to 
mention circuit splits) in its wake"). In this respect, then, the 
interpretation of fee-shifting statutes may differ from the usual 
practice of statutory interpretation.


But, alas, it is not that easy. Section 1132(g)(2) is not 
intended to promote enforcement of important federal policies 
by "citizens," because recoveries under section 1132(g)(2) are 
limited to plan fiduciaries, see 29 U.S.C. s 1132(g)(2) ("In any 
action under this subchapter by a fiduciary for or on behalf of 
a plan ...") (emphasis added), a group that at first glance 
seems less in need of favorable fee-shifting rules than the 
citizenry at large.

 That section 1132(g)(2) does not fit squarely within the four 
corners of Delaware Valley does not necessarily foreclose the 
application of SOCM; it does, however, require that we 
consider the specific text and purposes of section 1132(g)(2) to 
decide whether SOCM 's market-rate standard applies. We 
turn to Zipes and Fogerty for guidance. As in Zipes, the text 
of section 1132(g)(2) does parallel that of section 1988; both 
provide for a "reasonable" fee. Next, as Fogerty commands, 
we turn to the statute's purposes and legislative history to see 
whether the presumption that section 1132(g)(2) is to be 
interpreted in line with section 1988 is "overborne" by con-
trary evidence.

 Section 1132(g)(2) was enacted as part of the Multiemploy-
er Pension Plan Amendments Act of 1980 ("MPPAA"). In 
enacting the MPPAA, Congress was responding to an in-
crease in the financial instability of multiemployer pension 
plans, a problem it believed would continue to escalate unless 
action was taken. H.R. Rep. No. 96-869, pt. 1 at 52-57 (1980) 
("House Report"). The MPPAA put into place a number of 
measures intended to "protect retirees and workers who are 
participants in [multiemployer pension] plans against the loss 
of their pensions," id. at 51, including provisions that altered 
the funding requirements for multiemployer plans, required 
withdrawing employers to contribute to a plan's unfunded 
obligations, and adjusted the insurance provided by the Pen-
sion Benefit Guaranty Corporation. See id. at 65-70; see 
also Milwaukee Brewery Workers' Pension Plan v. Jos. 
Schlitz Brewing Company, 115 S. Ct. 981, 985 (1995) (review-
ing Congress's goals in enacting the MPPAA).


 Although most of the provisions of the MPPAA as enacted 
tracked the bill that originated in the House of Representa-
tives, H.R. 3094, the language of section 1132(g)(2) originated 
in the Senate bill, S. 1076. The following passage explains 
the Senate's understanding of the meaning of its language:

 Delinquencies of employers in making required contri-
 butions are a serious problem for most multiemployer 
 plans. Failure of employers to make promised contribu-
 tions in a timely fashion imposes a variety of costs on 
 plans. While contributions remain unpaid, the plan loses 
 the benefit of investment income that could have been 
 earned if the past due amounts had been received and 
 invested on time. Moreover, additional administrative 
 costs are incurred in detecting and collecting delinquen-
 cies. Attorneys fees and other legal costs arise in con-
 nection with collection efforts.

 These costs detract from the ability of plans to formu-
 late or meet funding standards and adversely affect the 
 financial health of plans. Participants and beneficiaries 
 of plans as well as employers who honor their obligation 
 to contribute in a timely fashion bear the heavy cost of 
 delinquencies in the form of lower benefits and higher 
 contribution rates. Moreover, in the context of this 
 legislation, uncollected delinquencies can add to the un-
 funded liability of the plan and thereby increase the 
 potential withdrawal liability for all employers.

 Recourse available under current law for collecting 
 delinquent contributions is insufficient and unnecessarily 
 cumbersome and costly. Some simple collection actions 
 brought by plan trustees have been converted into 
 lengthy, costly and complex litigation concerning claims 
 and defenses unrelated to the employer's promise and 
 the plans' entitlement to the contributions. This should 
 not be the case. Federal pension law must permit 
 trustees of plans to recover delinquent contributions 
 efficaciously. Sound national pension policy demands 
 that employers who enter into agreements providing for 
 pension contributions not be permitted to repudiate their 
 pension promises.


 The public policy of this legislation to foster the pres-
 ervation of the private multiemployer plan system man-
 dates that provision be made to discourage delinquencies 
 and simplify delinquency collection. The bill imposes a 
 Federal statutory duty to contribute on employers that 
 are already contractually obligated to make contributions 
 to multiemployer plans. A plan sponsor that prevails in 
 any action to collect delinquent contributions will be 
 entitled to recover the delinquent contributions, court 
 costs, attorney's fees, and double interest on the contri-
 butions owed. The intent of this section is to promote 
 the prompt payment of contributions and assist plans in 
 recovering the costs incurred in connection with delin-
 quencies.

Staff of Senate Committee on Labor and Human Resources, 
96th Cong., 2d Sess., S. 1076: The Multiemployer Pension 
Plan Amendments Act of 1980: Summary and Analysis of 
Consideration, at 43-44 (Comm. Print 1980) (hereinafter 
"Senate Committee Print").7 In the debates surrounding the 
enactment of the final version of the MPPAA, Representative 
Thompson, one of the sponsors of H.R. 3094, repeated this 
passage essentially verbatim on the floor of the House. 125 
Cong. Rec. 23,038, 23,039 (1980).

 We draw three lessons from section 1132(g)(2)'s text, pur-
poses, and legislative history.8 First, in enacting section 

__________
 7 The district court in Central States, Southeast and Southwest 
Areas Pension Fund v. Alco Express Co., 522 F. Supp. 919, 927-28 
(E.D. Mich. 1981) ("Central States"), in the course of a detailed 
review of the legislative history of section 1132(g)(2), explained that 
"[b]ecause S. 1076 was also referred to the Senate Committee on 
Finance there was no formal committee report, since Senate Rule 
XXVII requires a joint report under such circumstances." 522 
F. Supp. at 928 n.11.

 8 The above-quoted legislative history of section 1132(g)(2) refers 
in places to "pension plans," presumably because most of the 
MPPAA related only to pension plans, not to welfare benefit plans, 
the other type of employee benefit plan covered by ERISA. See 
29 U.S.C. s 1002(3). The Funds are both welfare benefit plans. 


1132(g)(2), Congress had a strong goal of "discourag[ing] 
delinquencies" and rendering delinquency collection less 
"cumbersome and costly." Senate Committee Print, at 44. 
Deterring parties from prolonging litigation is an important 
goal of most fee-shifting provisions. Here, however, Con-
gress's desire to achieve this goal was especially strong. 
Section 1132(g)(2) provides that the courts "shall" award fees 
to fiduciaries when judgments are awarded in their favor in 
delinquent-contribution actions. It makes no provision for 
prevailing defendants.9

 In statutes protecting economic interests, mandatory fee-
shifting is uncommon, and the same standards are usually 
applied to fee awards to both plaintiffs and defendants. See, 
e.g., Fogerty, 510 U.S. at 534 (concluding that fee-shifting 
under the Copyright Act is discretionary, and that the same 
standard should be applied in considering fee awards to both 
parties); id. at 525 n.12 (indicating that "courts have general-
ly awarded attorney's fees in an evenhanded manner based on 
the same criteria" under the trademark and patent laws); 
Eddy v. Colonial Life Ins. Co. of America, 59 F.3d 201, 205 
(D.C. Cir. 1995) ("In general, statutes protecting economic 
interests that contain fee-shifting provisions vesting discre-
tion in the district court do not create a presumption that a 
prevailing party will be awarded fees."). Congress's express 
requirement that the courts award fees to fiduciaries who win 
delinquent-contribution actions demonstrates an unusually 
powerful intent to deter excessive litigation by defendants. A 
rule that requires employers to pay the market rate in cases 
in which an attorney has discounted her fees for public-
spirited reasons surely serves this goal better than does one 

__________
Congress clearly signalled, however, that section 1132(g)(2) be 
interpreted in the same way whether welfare or pension plans were 
involved. The text of section 1132(g)(2) as enacted is equally 
applicable to both types of plans, as was the draft provision that 
was before the committee; much of the above-quoted legislative 
history is likewise equally applicable to both types of plans.

 9 They must therefore invoke 29 U.S.C. s 1132(g)(1), which allows 
the court to make a fee award "in its discretion." Id.


under which only fees actually paid out are recoverable. If a 
plan receives legal services from its attorneys for free, then 
the actual-cost rule would require the delinquent employer to 
pay nothing--a result clearly inconsistent both with Con-
gress's desire to deter employers from late payment and with 
the statute's requirement that the court "shall" award "rea-
sonable attorney's fees." Likewise, the fact that a plan 
receives its legal services at a deep discount should not justify 
a similar discount of section 1132(g)(2)'s deterrent effect.10

 A second important goal of fee-shifting provisions is to 
enable parties to hire "competent counsel" to pursue their 
cases. SOCM, 857 F.2d at 1521 (emphasis omitted) (citing 
section 1988's legislative history); see also Kay v. Ehrler, 499 
U.S. 432, 436 & n.8 (1991). Although this goal is not explicit-
ly stated in the legislative history of section 1132(g)(2), Con-
gress did express a strong desire to "simplify delinquency 
collection" and "assist plans in recovering the costs incurred 
in connection with delinquencies," Senate Committee Print, at 
44, goals that are best served if plan fiduciaries are able to 
hire competent counsel. Again, a fee-shifting rule that re-
quires delinquent employers to pay market rates serves this 
purpose better than does one under which they pay only the 
billed rate.11 In this case, the plan has agreed to pass on the 
entire amount of any fee award to its attorneys. Such an 
arrangement obviously improves the ability of plans to obtain 

__________
 10 Indeed, the plans that are closest to insolvency, and therefore 
need the deterrent effect of section 1132(g)(2) the most, would be 
most harmed by an actual-cost rule, as they are also the group that 
is likeliest to seek, and obtain, discounted legal services.

 11 Our dissenting colleague says that we assume mistakenly that 
"expensive counsel necessarily equals competent counsel." Diss. 
op. at 2. We do not deny that there exist expensive, incompetent 
counsel; but there is ordinarily a correlation between an attorney's 
rates and her competence. The lodestar approach to setting legal 
fees is premised on the idea that there is a market for legal 
services, in which an attorney's hourly rate is correlated with her 
abilities. SOCM similarly assumed that market rate fees are 
needed to attract competent attorneys in complex cases. See 857 
F.2d at 1521.


high-quality legal representation in the first instance. In-
deed, a plan that is near insolvency--as one of the plans at 
issue in this case, the Legal Services Plan, apparently was in 
early 199512--might otherwise find it quite difficult to secure 
the assistance of competent legal counsel in returning it to 
stability. On this point, we note that Congress enacted the 
MPPAA in order to stabilize financially ailing ERISA plans, 
see House Report, at 52-57; Senate Committee Print, at 1, 
and intended section 1132(g)(2) to further that objective, see 
Senate Committee Print, at 44 (referring to "the public policy 
of this legislation to foster the preservation of the private 
multiemployer plan system").

 Congress's preeminent purpose, in enacting section 
1132(g)(2), to keep ERISA plans solvent also points us in the 
direction of reading section 1132(g)(2) in a way that facili-
tates, rather than impedes, private charitable donations to 
plans. If an attorney has made a public-spirited decision to 
charge a plan a discounted rate, a delinquent employer should 
not receive the benefit of this decision. Judge Easterbrook in 
the Seventh Circuit has endorsed this point:

 Some lawyers dedicate their professional lives to causes 
 they find admirable and worthy of support--to legal 
 services for the poor, to the representation of unions. 
 These lawyers are making contributions to their favored 
 causes, not in money, but in time.... Using opportunity 
 cost as the measure of legal services means that the 
 value of the lawyer's gift inures to the favored cause, and 
 not to the adversary in litigation.

Barrow v. Falck, 977 F.2d 1100, 1105 (7th Cir. 1992). In this 
case, of course, the Trustees' attorney would receive any fees 
in excess of the amount billed; but the Trustees would benefit 
indirectly from such an award (as the award would presum-
ably make it easier for them to obtain competent counsel in 

__________
 12 In January, 1995, the Legal Services Fund's assets stood at 
$1,218. The Fund's present attorneys responded by adjusting their 
billing; they charged only when collection efforts were successful, 
and asked only their "regular hourly rate or a percentage of the 
amount actually collected, whichever was less."


the future), and JPR would not benefit at all.13 This ap-
proach also accords with the Supreme Court's consistent rule 
that under fee-shifting statutes legal services are to be given 
their market value, irrespective of the contractual arrange-
ments between attorney and client. See Blanchard v. Berger-
on, 489 U.S. 87, 93 (1989) ("Should a fee agreement provide 
less than a reasonable fee ..., the defendant should never-
theless be required to pay the higher [market-based] 
amount."); Blum, 465 U.S. at 893-96; see also Central States, 
Southeast and Southwest Areas Pension Fund v. Central 
Cartage Co., 76 F.3d 114, 116 (7th Cir.), cert. denied, 117 S. 
Ct. 56 (1996) (citing this principle in reading section 
1132(g)(2) to permit an award of attorney's fees at market 
rates to an organization represented by salaried staff coun-
sel); Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 
328 (5th Cir. 1995).

 JPR argues that the singular purpose of section 1132(g)(2) 
is to make plans whole, and that a fee award that exceeds the 
amount actually charged by a plan's attorneys is inconsistent 
with this purpose. Making plans whole is indeed one impor-
tant purpose of section 1132(g)(2). See Senate Committee 
Print, at 44 (stating that the section's intent is to "assist plans 
in recovering the costs incurred in connection with delinquen-
cies"). But, as we have established, section 1132(g)(2) has 
other, equally important goals, which are best served by a 

__________
 13 Under the collateral-source rule, "[p]ayments made to or bene-
fits conferred on the injured party from other sources are not 
credited against the tortfeasor's liability, although they cover all or 
a part of the harm for which the tortfeasor is liable." Restatement 
(Second) of Torts s 920A (1979). This rule would seem to apply by 
analogy to in-kind donations of an attorney's services. Charitable 
contributions are ordinarily treated as a collateral source like any 
other, for precisely the reason identified by Judge Easterbrook, the 
desire to ensure that the benefit of the gift accrues to the donee, 
not to the tortfeasor. See 4 Fowler V. Harper et al, The Law of 
Torts s 25.22 at 661-63 (2d ed. 1986); see also Hudson v. Lazarus, 
217 F.2d 344, 346-47 (D.C. Cir. 1954) (in a case under D.C. law, 
applying the collateral-source rule to free care received at a veter-
ans' hospital).


market-rate award. Furthermore, there is a real sense in 
which a market-rate award may be a peculiarly appropriate 
instrument by which to make the Funds whole. An ERISA 
plan may have only a finite pool of discounted or free legal 
assistance available to it; once this pool is used up, the plan 
will then be required to pay higher rates for legal services. 
Compelling a plan to draw on its limited stock of discounted 
legal help thus has meaningful costs to the plan, and should 
be compensable.14

 We also reject JPR's argument that this case is governed 
by Eddy v. Colonial Life Ins. Co. of America, 59 F.3d 201 
(D.C. Cir. 1995). In Eddy, we interpreted a different ERISA 
fee-shifting provision, section 1132(g)(1). Under that provi-
sion, in any action under subchapter I of ERISA "by a 
participant, beneficiary, or fiduciary," a court may, "in its 
discretion," make an award of a "reasonable attorney's fee 
and costs of action to either party." 29 U.S.C. s 1132(g)(1) 
(1994). Subchapter I of ERISA can support a wide range of 
actions, including actions to enforce Plan terms or to recover 
benefits, suits for breach of fiduciary duty, actions to obtain 
information from plans, and equitable proceedings. See 29 
U.S.C. ss 1132(a), 1132(c). Eddy concluded that the pre-
sumption applied under civil-rights fee-shifting statutes that 
successful plaintiffs should receive an attorney's fee award 
should not apply to section 1132(g)(1). JPR points to Eddy's 
observation that ERISA protects economic interests, while 
the civil rights statutes protect "dignitary as well as economic 
interests," 59 F.3d at 204, and claims that the same logic 
argues against applying SOCM to this case.

 Eddy was a straightforward application of Fogerty's com-
mand to consider the purposes of a fee-shifting statute in 

__________
 14 For this reason, the dissent is mistaken in suggesting that we 
are offering a "windfall" to those plans that decide to keep the 
excess of a fee award over the amount billed. Diss. op. at 2. If 
only a limited amount of discounted legal help is available to a plan, 
then drawing on that pool of legal help has an opportunity cost to 
the plan. When the pool runs out, the plan will need the supposed 
"windfall" to pay its lawyers.


deciding whether to apply caselaw developed under another 
fee-shifting provision. See Eddy, 59 F.3d at 205 (citing 
Fogerty ). ERISA's legislative history contained no evidence 
that Congress's goals in enacting section 1132(g)(1) would 
have been furthered by establishing a presumption in favor of 
awards to successful plaintiffs. See id. (This is no surprise, 
given the smorgasbord of proceedings in which section 
1132(g)(1) may be invoked.) In the absence of legislative 
history, Eddy considered the broad purposes of ERISA; it 
cited the civil rights laws as an example of a category of 
statute that would justify a presumption in favor of an award 
of fees, and contrasted the dignitary interests protected by 
the civil rights statutes with the economic interests furthered 
by ERISA. In this case, by contrast, the legislative history 
and specific purposes of section 1132(g)(2) both point towards 
allowing market-rate fee awards. We therefore need not, as 
we did in Eddy, resort to considering the general nature of 
ERISA as a statute protecting economic interests.

 2. Detecting Public-Spirited Discounts 

 Having decided that the policies underlying section 
1132(g)(2) support an allowance to the Trustees of fees at 
market rates, assuming the fees actually paid were discount-
ed for public-spirited reasons, the task remains of deciding 
whether the fees paid did in fact reflect a public-spirited 
discount by the counsel. We leave this task initially for the 
district court, with a brief discussion of the guiding principles 
of law.

 We explained in Covington that the fee applicant bears the 
burden of demonstrating that a fee incorporates a public-
spirited discount:

 [T]he attorney must show that his or her custom of 
 charging reduced rates is in fact attributable to "public 
 spiritedness." Implicit in this line of inquiry is the 
 assumption that the law was not written to subsidize 
 attorneys who charge below-market rates because they 
 cannot command anything more. And a defendant is 
 free to rebut a fee claim on these terms in cases in which 
 this issue is posed. We recognize that, in some cases, 


 this may be a difficult line of inquiry, for an attorney who 
 cannot command market rates invariably will have a 
 "custom" of charging rates below the market. This 
 problem is diminished with respect to attorneys who 
 charge variable rates (both at and below the market, with 
 the latter attributable to public-spirited goals).

Covington, 57 F.3d at 1108. We concluded that it was within 
the district court's "sound discretion" to determine whether 
an attorney had public-spirited reasons for charging reduced 
rates. Id.

 Deciding whether an attorney has a public-spirited reason 
for a representation should not be all that difficult. An 
important part of this inquiry will focus on whether the fee 
charged in fact differs significantly from the market value of 
the attorney's services. We discuss the process of deciding 
the correct market rate for an attorney's services in the next 
section of this opinion; because the district court may find it 
easier to decide the market value of an attorney's work than 
to analyze her motivations, it may be appropriate to perform 
this analysis first.

 Turning to the question of the attorney's motivations, we 
emphasize that it is only necessary for the attorney to show 
that public-spiritedness was a principal reason for the dis-
count, and not that it was the only reason. It is rare to find a 
person who has only one reason for the things she does, and 
the presence of other motivations need not vitiate an attor-
ney's public-spiritedness. Client development and attorney 
training, for instance, are accepted corollaries of pro bono 
representation. See Esther F. Lardent, Structuring Law 
Firm Pro Bono Programs, The Law Firm and the Public 
Good 59, 72 (Robert A. Katzmann ed., 1995). Nor does the 
possibility of a fee award necessarily taint an attorney's 
motives. Such an award will only be forthcoming if the 
attorney wins, and will be no more than the amount the 
attorney could have obtained for her time on the free market. 
An attorney who was principally motivated by the desire to 
make money would not rely on such awards, but would seek 
out clients who were able to pay the full market rate, so that 


she could be assured of being paid at that rate whether she 
won or lost.

 As officers of the court, attorneys will presumably not be 
inclined to misrepresent their reasons for granting a discount, 
and we assume that it will only rarely be necessary to second-
guess those reasons. An affidavit from the client may also 
help to establish that the client understood that the fee it was 
being charged reflected a public-spirited discount, even if it 
may not have been expressly stated that this was the case. 
In some circumstances, however, there may be a clear expla-
nation for a discount other than a desire to serve the public 
good (or market forces, which are taken into account in the 
market-rate inquiry). For instance, an attorney who gives a 
discount to a relative would need to make a strong showing 
that the discount was actually motivated by the public inter-
est, and not by familial ties. We leave to the district court, in 
the first instance, the task of deciding the motivations of the 
Funds' attorneys.

 3. Determining the Market Rate

 As we explained in Covington, a party who avers that the 
rate charged by her attorneys incorporated a public-spirited 
discount must offer evidence as to the correct market rate for 
the attorneys' services. The party must both "offer evidence 
to demonstrate [her] attorneys' experience, skill, reputation, 
and the complexity of the case" and "produce data concerning 
the prevailing market rates in the relevant community for 
attorneys of reasonably comparable skill, experience, and 
reputation." 57 F.3d at 1108. In setting the market rate, the 
district court should consider what rate would be commensu-
rate with the attorneys' skill and experience, and with the 
quality of the attorneys' work. To cite one of the dissent's 
examples, if a firm uses a case as a training-ground for young 
attorneys, the district court might find that the discounted 
rate charged by the firm reflected the attorneys' inexperi-
ence, and is the actual market value of the attorneys' services. 
Because the district court is most familiar with the quality of 
the attorneys' work, we will defer to its reasonable assess-
ment of that work's market value.


 Both the Trustees and JPR submitted evidence on prevail-
ing market rates and on the skill and experience of the 
Funds' attorneys. Because the district court did not reach 
the question of the appropriate market rate, we will not 
discuss these two factors further; Covington contains a de-
tailed discussion of these questions. See Covington, 57 F.3d 
at 1108-10. We leave the issue of the prevailing market rate 
to the initial discretion of the district court.

C. Fees for This Appeal

 Finally, the Trustees seek an award of the attorney's fees 
expended in prosecuting this appeal. As a rule, in fee 
disputes, if an award of attorney's fees is appropriate in the 
underlying litigation, such an award is also appropriate for a 
successful appeal (or defense of an appeal) of an issue relating 
to the fee award itself. This is so because, for fee-shifting 
provisions to serve their purposes (which may include, de-
pending on the particular provision at issue, improving access 
to the courts, encouraging or discouraging certain types of 
litigation, or making litigants whole), their beneficiaries must 
be assured that they will be able to collect the fee awards that 
they are due. See American Federation of Government 
Employees v. FLRA, 994 F.2d 20, 22 (D.C. Cir. 1993) ("No 
matter what the purpose of an attorney's fee provision ... 
the availability of 'fees for fees' is essential to carrying out 
Congress's goal in including the provision in the first place."). 
This rule is fully applicable to fee awards under section 
1132(g)(2). See Building Service Local 47 Cleaning Contrac-
tors Pension Plan v. Grandview Raceway, 46 F.3d 1392, 1404 
(6th Cir.1995) (finding that fees for successful appeals of 
attorney's fee disputes are recoverable under section 
1132(g)(2)); Operating Engineers Pension Trusts v. B & E 
Backhoe, Inc., 911 F.2d 1347, 1356 (9th Cir. 1990) (same). 
The Trustees cannot be said to be successful in their appeal 
of the attorney's fee issue, however, until they establish on 
remand that their attorneys did indeed discount their fees for 
public-spirited reasons. Cf. Hanrahan v. Hampton, 446 U.S. 
754, 758-59 (1980) (party is a "prevailing party" under section 
1988 only by virtue of success on the merits, not success in 
obtaining remand on appeal); Waterman Steamship Corp. v. 


Maritime Subsidy Board, 901 F.2d 1119, 1122 (D.C. Cir. 
1990) (in a fee-shifting case under the Equal Access to Justice 
Act, observing that "award of EAJA fees for corrective 
efforts that yield no real-world benefit would reduce the 
normal deterrent to litigative nit-picking").15 If the Trustees 
do meet success on remand, the district court should make an 
additional award of fees reflecting those legal expenses the 
Trustees incurred in their appeal of the attorney's fees issue 
(but not that of the audit fees issue).

 III. Conclusion

 We affirm the district court's conclusion that the Trustees 
were not entitled to audit fees. The language of the Default 
and Payment Clause cited by the Trustees does not cover the 
routine audit that is at issue in this case. As to the auditor's 
services in the litigation before the district court, we affirm 
the district court's conclusion that the Trustees failed to 
provide adequate documentation of the need for this work.

 We conclude, however, that the district court was mistaken 
in finding that section 1132(g)(2) necessarily limits the Trust-
ees to recovering their actual legal fees. If the Trustees can 
establish that their attorneys charged them a discounted rate 
for public-spirited reasons, they may recover a fee award at 
the market rate, rather than at actual cost. If the district 
court finds on remand that the Trustees are entitled to an 

__________
 15 Section 1132(g)(2) does provide that "in any action under this 
subchapter ... in which a judgment in favor of the plan is awarded, 
the court shall award the plan ... (D) reasonable attorney's fees 
and costs of the action...." 29 U.S.C. s 1132(g)(2). The decision 
of this court vacating and remanding the district court's ruling on 
the fees issue is denominated a "judgment," see Fed. R. App. P. 36, 
and could be said to be "in favor of the plan" in the sense that the 
Trustees have achieved the relief that they sought from this court 
on the issue they appealed. But a more natural reading of "judg-
ment" in this context limits it to the original proceeding before the 
district court, in view of the subsequent listing of the content of the 
award, which includes "the unpaid contributions," interest, and 
liquidated damages, in addition to "attorney's fees and costs of the 
action."


award of fees at market rates, the district court should also 
make an award of fees incurred by the Trustees in bringing 
their appeal of the attorney's fees issue.

 We therefore vacate the district court's award of attorney's 
fees, and remand for proceedings consistent with this opinion.

 So ordered. 



 Randolph, Circuit Judge, concurring in part and dissent-
ing in part: I dissent from the portion of the majority 
opinion relating to attorney's fees. In my view, employee 
plans are not entitled to recover more than their actual cost 
of legal services.

 When a plan wins its case, the court "shall award" the plan 
"reasonable attorney's fees and costs of the action, to be paid 
by the defendant," 29 U.S.C. s 1132(g)(2). It is true that 
language like this appears in 42 U.S.C. s 1988 (and countless 
other fee-shifting statutes); that Blum v. Stenson, 465 U.S. 
886 (1984), interpreted s 1988 to mean that a "reasonable" 
fee should be calculated by using the market hourly rate 
rather than the rate actually charged; and that Independent 
Federation of Flight Attendants v. Zipes, 491 U.S. 754, 758 
n.2 (1989), said that similarities in the language of fee-shifting 
statutes are a "strong" indicator of similarities in meaning. 
But Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994), 
"squelched"--to use the Seventh Circuit's word--"[a]ny ten-
dency to treat all attorneys' fees statutes as if they were 
insignificant variations on s 1988." Stomper v. Amalgamated 
Transit Union, Local 241, 27 F.3d 316, 318 (7th Cir. 1994). 
After Fogerty, "[d]ifferent statutes receive individual analy-
sis," or should. Id.

 As to the particular statute before us, it seems to me that a 
cost-of-service award, in combination with the other provi-
sions in s 1132(g)(2), fully accomplishes "Congress's preemi-
nent purpose ... to keep ERISA plans solvent," maj. op. at 
18. Victorious plans are entitled not only to reasonable 
attorney's fees and the amount of the delinquent contribu-
tions, but also to double interest on those contributions and to 
any other "legal and equitable relief ... the court deems 
appropriate." 29 U.S.C. s 1132(g)(2)(A)-(E). In the face of 
provisions furnishing ample deterrence for delinquent em-
ployers and ample compensation to victorious plans, I see no 
good reason why a plan should also be awarded more than its 
lawyers charged it. The majority thinks that unless market-
based fees are awarded, plans will be unable to hire "compe-
tent counsel." Maj. op. at 17. This strikes me as doubly 


mistaken. For one thing it assumes that expensive counsel 
necessarily equals competent counsel, an equation not borne 
out by my experience. For another thing it contemplates 
only one kind of fee arrangement--one requiring the client to 
turn over the excess to its lawyer. We apparently have that 
arrangement in this case. But in other cases the retainer 
agreement may be such that the plan, rather than its below-
market-rate lawyer, keeps the windfall. I have no way of 
knowing which is the more common fee agreement in these 
sorts of cases and neither do the other judges on this court.

 My colleagues charge the district court with the duty of 
deciding whether the lawyers in this case gave the plan a 
discount for "public-spirited reasons." This sounds like a rule 
saying that market rates will be awarded only if the lawyers 
never expected to receive market rates. A lawyer cannot be 
acting out of public spirit in a case, I suppose, if he hopes or 
expects to collect the full going rate. At least that is the 
theory. Yet once the majority's rule goes into place, every 
reasonable lawyer representing an employee benefit plan 
against an employer--reasonable because the lawyer has read 
my colleagues' opinion--will hope to recover fees at the 
market rate. And that is scarcely the only difficulty. Con-
sider the conundrum posed by lawyers who had mixed mo-
tives for taking the case at less than the market rate. 
Suppose, for instance, the law firm thought that by represent-
ing the plan at a discount, it was doing some public good; 
that besides, the case would help fill in some gaps on the 
firm's timesheets; that the case would be a useful training 
ground for a young associate or two; that taking the case 
might lead to, or help retain, full-fee paying clients; and that 
if the firm won, it would wind up getting the going rate 
anyway. I suspect that such a range of motives would 
typically be uncovered if one probed deeply enough. Then no 
one would be able to say where "public spiritedness" ended 
and self interest began, or what imaginary scale determines 
which outweighs the other. This only reinforces my belief 
that s 1132(g)(2)--correctly interpreted--permits victorious 


plans to be reimbursed for no more than their cost of legal 
services. But as between a rule awarding market rates only 
when the below-market lawyer satisfies the majority's motiva-
tional criterion, and a rule awarding market rates in every 
case, the latter is clearly the lesser evil, if for no other reason 
than it is better to clear up a mess than to create one.